BASTIAN v. NEBEKER et al.

No. 2898.    Decided Dec. 27, 1916.    On petition for rehearing March 29, 1917.    (163 Pac. 1092.)

1.  WATERS AND WATER COURSES—SUIT TO QUIET TITLE—BURDEN OF PROOF—DEVELOPED WATER. Where a party goes upon a stream at or near its source, the waters of which have been appropriated, and are being used for beneficial purposes, and intercepts a subterranean flow or body of water and diverts any substantial flow therefrom which he claims to be developed water, the burden is upon him to show by satisfactory proof that the water so intercepted and diverted is "developed water"; and where it is shown that the water is drawn from the same underground flow or body of water that wholly or partially feeds and supplies the springs from which the prior appropriator obtains his water, the subsequent appropriator claiming developed water must show by clear, positive, and convincing evidence that the water claimed by him is developed water.[1]    (Page 399.)

2.  WATERS AND WATER COURSES—EVIDENCE—SUFFICIENCY. In a proceeding to determine water rights for irrigation purposes, evidence *held* not to sustain a finding that 84⅞ per cent. of the water flowing from well of subsequent appropriator was developed water.    (Page 399.)

[1]*Mountain Lake Min. Co.* v. *Midway Irr. Co.*, 47 Utah 346, 149 Pac. 929.

Appeal from Sixth District.

3. WATERS AND WATER COURSES—COST—MEASURE OF WATER. As the burden of proof is on plaintiff subsequent appropriator to show by clear and convincing evidence that the water claimed by him is developed water, he must bear the entire expense of measurement and tests of such water. (Page 400.)

4. WATER AND WATER COURSES—SEEPAGE WATER. The prior appropriators were entitled to a decree awarding them a substantial flow of seepage water which was tributary to the main stream to which they had the right to the entire flow, and which is intercepted and carried to subsequent appropriator's reservoir by a ditch. (Page 400.)

5. WATERS AND WATER COURSES—IRRIGATION—EVIDENCE—PRESUMPTION. As it appeared that the subsequent appropriator intended to convey water from his reservoir to a point several miles from the prior appropriator's land, it will be presumed that no substantial amount conveyed from subsequent appropriator's wells to the reservoir will find its way into the natural water channel belonging to prior appropriators, and hence that no part of the water can be reclaimed by prior appropriator after its use by the subsequent appropriator. (Page 400.)

6. WATERS AND WATER COURSES—EVIDENCE—SUFFICIENCY. Evidence held not to sustain a finding that the storing of water in plaintiff subsequent appropriator's reservoir did not render any water .owned by the prior appropriators impure and unwholesome or unfit for culinary use. (Page 400.)

7. WATERS AND WATER COURSES—SEEPAGE WATER. If there are springs and seeps of water arising in the bed of the subsequent appropriator's reservoir, which would flow into a natural channel belonging to the prior appropriators in any substantial amount, it should be awarded to the prior appropriators. (Page 402.)

On Petition for Rehearing.

8. COSTS—APPEAL—EXPENSE OF PRINTING BRIEF. Where appellant incorporated into the brief a large portion of the printed abstract, the respondent will not be required to pay the cost of printing such matter in the brief which is also contained in the abstract. (Page 404.)

Appeal from District Court, Sixth District; *Hon. F. C. Loofbourow*, Judge.

Action by Gearson S. Bastian against George W. Nebeker, and another.

Judgment for plaintiff. Defendants appeal.

REVERSED and remanded with directions.

*Richards, Hart & Van Dam, John F. Chidester* and *F. K. Nebeker* for appellants.

*Thurman, Wedgwood & Irvine* and *E. E. Hoffman* for respondent.

## STATEMENT OF FACTS.

The facts in this case are about as follows: In the year 1870 George W. Nebeker, one of the defendants, located upon and acquired a "squatter's right" to a piece of meadow land of about twenty acres, known as King's Meadows, and situate in what is known as King's Meadows canyon, in Sevier County, Utah. This canyon extends from the base of a range of hills or mountains contiguous to, and on the east side of, Sevier Valley, in a southeasterly direction to the divide or summit of the hills, a distance of about seventeen miles. In 1877 he went upon and made a pre-emption entry to 160 acres of arid land located in King's Meadows canyon below and about one and one-half miles northerly from King's Meadows. Later he changed his pre-emption to a homestead entry. Immediately after locating upon the land he commenced clearing and breaking it up and raising crops thereon. The acreage of tilled land was gradually increased from year to year until in 1911, when he had under cultivation about 150 acres, all of which required irrigation in order to produce crops. In the meantime George W. Nebeker, Jr., his son, acquired an interest in the ranch and the water rights appurtenant thereto. Mr. Nebeker, immediately on taking possession of the land covered by the homestead, diverted thereon all of the water flowing in King's Meadows canyon that was not lost by seepage and evaporation before it reached that point, and continuously and uninterruptedly for many years thereafter used it for irrigating his land and for culinary purposes. The evidence shows that King's Meadows canyon is dry and barren, and has less vegetation than most of the canyons in Utah. The only water obtainable in the canyon for irrigation, domestic, and culinary purposes is the water that rises on King's Meadows and a small stream at what is

known as the Willow Patch about four miles above the meadows. The water channel in the canyon passes through the meadows in a northerly direction. About fifteen acres of the meadows are on the east, and a small portion of them on the west side of the channel. There are about thirty springs, and numerous seeps, on the meadows. When not diverted or otherwise interfered with the water from these springs and seeps flows into the main channel and down the canyon to the Nebeker homestead.

In March, 1900, a decree was entered in the district court of Sevier County in a suit in which George W. Nebeker et al. were plaintiffs and Andreas Anderson (plaintiffs' predecessor in interest, then owner of King's Meadows) was defendant, wherein fifteen-sixteenths of all the water of King's Meadows creek and its tributaries was awarded to Nebeker and his co-plaintiff, and one-sixteenth to Anderson. The decree in that case also gave the plaintiff therein one-third of the waters arising above the south boundary of the King's Meadows ranch until the 15th day of June of each year. This water comes from the Willow Patch mentioned, which, as stated, is about four miles up King's Meadows canyon south from the meadows. After the entry of the decree in that suit Nebeker exchanged his one-third interest in the waters flowing from the Willow Patch for Anderson's one-sixteenth interest in the waters arising on and flowing from the meadows, the waste water flowing from the irrigated land of King's Meadows and the overflow or surplus water from a reservoir which Anderson at the time was preparing to construct and later on did construct at or near the Willow Patch. During the year 1909, and early part of 1910, Ephraim and Ole Dastrup, two of plaintiff's predecessors interest, constructed eleven flowing wells on the King's Meadows within the zone or area of the springs and seeps mentioned. In August, 1910, G. S. Bastian, plaintiff herein, acquired title to the King's Meadows and all water rights appurtenant thereto. Soon after taking possession of the property Bastian drove four additional flowing wells thereon, making fifteen flowing wells on the meadows. The depth of these wells vary from about 85 to 260 feet, and most of them are in close proximity

to the springs and seeps referred to which supply the Nebeker
ranch with water. The temperature of the water flowing
from the wells and the water issuing from the springs is
substantially the same. In some cases it is identical. When
the wells are unplugged for a few days some of the seeps and
at least one spring go dry. Bastian, after he obtained title
to King's Meadows, constructed a reservoir in King's Mead-
ows canyon near the north boundary of his land and a con-
siderable distance from and south of the Nebeker ranch. . He
also constructed a ditch, referred to in the bill of exceptions
as the ''drain ditch.'' This ditch is on the west side of and
in close proximity to the natural water channel where the
same passes through King's Meadows. This drain ditch, the
bottom of which is not as low as the bed of the natural water
channel, carried the water from the wells and the seepage
water that was intercepted in the course of its construction
to plaintiff's reservoir located between the meadows and the
Nebeker ranch. The water flowing from the springs at King's
Meadows to the Nebeker ranch is not permitted to mingle
with the water impounded in the reservoir, but is conveyed
past the reservoir in a pipe line and returned to the natural
channel below the reservoir dam. Soon after the wells were
constructed in 1910, Nebeker complained to the Dastrups that
the wells interfered with and reduced the flow of water from
the springs and seeps on King's Meadows to such an extent
as to appreciably diminish the size of the stream flowing to his
ranch. We here remark that the evidence, without conflict,
shows that this stream of water, when not diverted or other-
wise interfered with before it reaches the Nebeker ranch, is
not more than sufficient to supply the ranch with water for
irrigation, culinary, and domestic purposes. The Dastrups
had a weir constructed in the channel north of where the
spring and seepage water is collected in a body after it leaves
King's Meadows and the stream measured by a Mr. Louis
Jones, who, the record shows, had had much experience in
measuring streams of water by the weir formula of measuring
water. Jones testified that he measured the water where it
passed over the weir in July, 1910, April 6 and May 25, 1911,
and April 14 and May 30, 1912; that the flow of water varied

from .29 to .30 second foot. He also testified that on May 25, 1911, he measured the water from the wells and springs, and that the combined flow was .75 second foot; that on May 20, 1912, he again measured the water from the wells, and that the entire flow was .48 second foot; that on the same day (May 20th), the flow from the springs was .25 second foot. Marks were made on the weir so as to indicate the extent of the decrease, if any, in the flow of the water from the springs when the wells were uncapped and permitted to flow their full capacity, and the amount of the flow when the wells were plugged. These tests and the measurements did not settle, nor tend to settle, the controversy respecting the effect, if any, the driving of the wells had on the flow of water from the springs. The Nebekers' claimed that by permitting the wells to flow and impounding the water therefrom in the reservoir mentioned reduced the flow from the springs about one-fourth.

On July 2, 1912, Bastian commenced this action to restrain the Nebekers from interfering with and diverting the water from the flowing wells, and thereby preventing the same from flowing into his reservoir. He alleges in his complaint that the water from the wells is developed water, and that he intends to impound and store it "particularly during the early spring so as to enable the plaintiff to use the same later in the irrigation season on orchard and other lands owned by plaintiff in and around the town of Sigurd, which lands are situate about five miles down the canyon from said land on which said water is developed by means of the flowing wells," and he prays that he be adjudged to be the owner of the water from the wells, and that his title to it be quieted. Defendants in their answer deny that the well water is developed water; deny that the plaintiff is the owner or entitled to the use of any part of it. As an affirmative defense and counterclaim defendants allege that they are the owners of the water arising on King's Meadows, regardless of whether such water arises from the springs and seeps or flows from the wells thereon; that King's Meadows is an artesian basin, and "that the springs and seeps, which for the most part supply these defendants with water, are located all over a natural meadow or swamp in said basin formed, created and main-

tained by the pressure of water from the higher lands and from underneath the surface thereof; * * * that, a diversion of water from one part of the basin is practically a diversion from the whole and draws on the common supply therein.'' Other issues presented by defendants' affirmative defense and counterclaim are whether the plaintiff, in the construction of a reservoir, covered up certain springs or seeps of water belonging to the defendants and intercepted water from other springs, and also whether the construction of said reservoir adjacent to a salt bed did not befoul and cause to be impure and salty water used below by the defendants for culinary and domestic purposes, and also whether the construction of a certain drain ditch by the plaintiff did not intercept and drain spring water and water from seeps and oozes belonging to the defendant.

There is, as is usually the case in this class of actions, a conflict in the evidence on the principal points involved. The court found that the wells driven by plaintiff and his predecessors in interest ''have developed water which had theretofore been unappropriated by any person or persons whomsoever, and which had theretofore not found its way to the surface; that plaintiff stored and intended to continue to store said waters so developed in said reservoir before mentioned for the purpose of irrigating said orchard lands or other lands belonging to the plaintiff; that the driving of said wells and storing of water thereof in said reservoir did not render any waters owned by the defendants impure or unwholesome or unfit for culinary use; that the quantity of water developed by the plaintiff and his predecessors in interest by said flowing wells, and which water theretofore had not been appropriated, is 84⅘ per cent. of all the water flowing from said wells, the remaining 15⅕ per cent. of the waters flowing therefrom being the quantity that said springs have lost by reason of the driving of said wells; that the construction of the reservoir in which said water was to be stored by plaintiff did not destroy any of the springs or seepages belonging to the defendants, and defendants were not damaged by the building of the said reservoir by the plaintiff.''

A decree in conformity with and responsive to the findings was duly entered. Defendants appeal.

McCARTY, J. (after stating the facts as above).

The first question presented by the appeal is, Did the court err in its findings of fact wherein it held that 84⅜ per cent. of the water flowing from the wells is developed water that did not, before the wells were constructed, come to the surface of the earth through the orifices and subterranean channels from which issues and flows the spring and seepage water of King's Meadows?

The court, in effect, found, and there is an abundance of evidence to support the finding, that the waters from the wells and the normal flow of the springs and seeps came from the same source and are supplied by the same underground reservoir or body of water. In fact no other conclusion is permissible from the evidence, considered, as it must be, in its entirety. Counsel for respondent concede this. In their printed brief they say:

"There is no question made by us,  *  *  *  but what the operation of the wells did interfere with the water of some of the springs to the extent of taking therefrom a small percentage of the water."

The court, before the trial was concluded, suspended proceedings and made an order that:

"The water in dispute be measured on the 21st day of June, 1912, and that immediately after such measurements that the wells be plugged so as to prevent any waters flowing therefrom; that five days later, to wit, June 26th, the waters flowing in said basin be measured; that on July 1, 1912, the waters flowing from said basin be again measured, and immediately after such measurement that the wells be turned loose so that the water may flow therefrom; that on July 11, 1912, the waters from the wells and springs be measured separately; that on July 21, 1912, the said waters flowing from said wells and springs be measured separately, and that the wells be then plugged so as to prevent any water from flowing therefrom; that said measurements be continued each

and every month thereafter in the same manner    *    *    *
until final trial of this cause.''

The court appointed J. Oscar Anderson, a civil engineer,
"as the agent of the court to make such measurements."
Anderson, in pursuance of the order, made measurements
as therein directed to and including July 1, 1912, and there-
after made measurements every ten days, instead of every
five days, to and including January 21, 1913.   The flow of
the water from the spring, as shown by the several measure-
ments, also the flow from the wells when unplugged, was as

| follows: | Well Water. | Spring Water. |
|---|---|---|
| June 21 (wells unplugged) .453 | .263 |  |
| June 26 (wells plugged) | | .336 |
| July 1 (wells plugged) | | .336 |
| July 11 | .440 | .263 |
| July 21 (wells plugged) | | .338 |
| August 1 | .438 | .263 |
| August 11 (wells plugged) | | .335 |
| August 21 | .438 | .249 |
| Sept. 1 (wells plugged) | | .365 |
| Sept. 11 | .439 | .293 |
| Sept. 21 (wells plugged) | | .352 |
| Oct. 1 | .540 | .30 |
| Oct. 11 (wells plugged) | | .364 |
| Oct. 21 | .452 | .293 |
| Nov. 1 (wells plugged) | | .388 |
| Nov. 11 | .439 | .291 |
| Nov. 21 (wells plugged) | | .365 |
| Jan. 1 (wells plugged) | | .394 |
| Jan. 21 | .452 | .313 |

The decimals indicate fractions of a second foot.

The result of the measurements made by Anderson in pur-
suance of the court's order shows that when the wells are
permitted to flow continuously for a period of ten days only,
there is a substantial reduction in the flow of water from the
springs.   To what extent a continuous and uninterrupted flow
from the wells would affect the springs in the course of a
few months or a year is a matter of conjecture only.

It is settled law in this jurisdiction that where a party goes upon a stream at or near its source, the waters of which have been appropriated and are being used **1** by others for beneficial purposes, and intercepts or taps a subterranean flow or body of water and diverts any substantial flow therefrom which he claims to be developed water, the burden is upon him to show by satisfactory proof that the water so intercepted and diverted is "developed water." *Mountain Lake Min. Co.* v. *Midway Irr. Co.*, 47 Utah 346, 149 Pac. 929. And where, as in the case at bar, it is shown by indisputable evidence that the water claimed to be developed water is drawn from the same underground flow or body of water that wholly or partially feeds and supplies the springs from which the prior appropriator obtains his water, the subsequent appropriator, the party claiming to have developed water, should be required to show by clear, positive, and convincing evidence, that the water claimed by him is developed water. *Mountain Lake Min. Co.* v. *Midway Irr. Co.*, *supra,* and cases there cited.

The evidence in this case, as the record now stands, regarding the effect that a continuous and uninterrupted flow of the wells would eventually have upon the flow **2** of water from the springs is, as stated, a matter for conjecture and theory only. The plaintiff, therefore, did not support his claim that 84 7/8 per cent. of the water flowing from the wells is, as found by the court, developed water, by that quantum of evidence required in cases of this kind. The proof on this pont, as the record now stands, furnishes as sound a basis for concluding that a continuous, unimpeded flow of water from the wells, for a considerable period of time, would materially reduce the flow of the springs below the lowest point shown by the measurements made by Anderson, if it did not entirely dry up the springs, as it does for concluding that it would not reduce the flow of the spring water below what it was when the measurements were made. The court therefore erred in making the finding of fact last referred to.

The trial court, by appointing some person, familiar with the rules for measuring water, to measure the water

Bastian v. Nebeker et al., 49 Utah 390.

flowing from the spring and seeps at intervals for a reasonable length of time while the wells are plugged and then make measurements at intervals for a considerable length of time when the wells are flowing at their full capacity, ought to be able to determine approximately the amount of developed water, if any, that flows from the wells. Should the trial court on retrying the case make an order that further measurements and tests be made to determine the amount of developed water, if any, produced by the wells, the entire expense of such measurements and tests should be borne by the plaintiff, because, as stated, the burden is on him to show by clear and convincing evidence that the water claimed by him is developed water.

The evidence shows that plaintiff's trench or drain ditch situated just west of and in close proximity to the natural water channel where the same passes through King's Meadow intercepts and carries to plaintiff's reservoir a substantial flow of seepage water. This seepage water is tributary to the main stream used by the Nebekers, and the court erred in not awarding and decreeing it to them.

The evidence further shows, in fact it is conceded, that no part of the seepage water intercepted by the drain ditch, nor any portion of the water flowing from the wells to the reservoir, is used or is intended for use on lands within the King's Meadows basin. Nor is it used or intended for use upon any land in or bordering on King's Meadows canyon, but, as alleged by plaintiff in his complaint, it is his intention to convey the water from the reservoir to and on lands in and around Sigurd in Sevier Valley, several miles north of defendant's lands. Therefore the presumption may be indulged that no substantial amount of the water conveyed from the wells to the reservoir will find its way into the natural water channel at any point or points above the Nebeker ranch; hence no part of this water can be reclaimed by the Nebekers after its use by the plaintiff.

The evidence practically without conflict shows that the bed of the reservoir located a short distance north of King's Meadows is adjacent to a salt bed, and that when wated is impounded in the reservoir it partially

submerges the salt bed. While there is an apparent conflict in the evidence as to whether the water in the reservoir becomes befouled and unfit for culinary and domestic purposes, the greater weight of the evidence, nevertheless, tends to show that this water, because of the salt and mineral substances with which it comes in contact, is rendered unfit for culinary and domestic purposes, and that sufficient of the seepage and percolating water from the reservoir flows directly into the natural water channel and thence into the stream used by the Nebekers to render it unfit for culinary and domestic purposes. The evidence without conflict shows that the Nebekers, because of the unpotable state of the water flowing to their ranch, have been compelled to haul water for culinary and domestic purposes from a point above the reservoir dam. The court therefore erred in its findings of fact, wherein it is held that:

"The storing of water in said reservoir did not render any water owned by the defendants impure and unwholesome or unfit for culinary use."

The findings of fact and conclusions of law were made and judgment rendered September 4, 1914. On January 2, 1915, defendants duly served and filed notice of motion to move for a new trial. One of the grounds stated in the motion is, "Newly discovered evidence material for defendants * * * which they could not with reasonable diligence have discovered and produced at the trial." In support of the motion defendants filed affidavits in which, among other things, it was recited:

"That since the taking of testimony in this case upon the former trial at Richfield, said county and state, the reservoir belonging to said plaintiff which, during the said trial and for many months prior thereto was covered with water, broke and the water was drained from said reservoir exposing the bed thereof to view, and disclosed the fact that there were springs and seeps in the said reservoir bed, as contended by said defendants at the said trial."

No counter affidavit was filed by respondent.

Should it develop upon the taking of further evidence that there are springs and seeps of water arising in the bed

of the reservoir that find their way into the natural     **7**
water channel, this water, if flowing in any substantial
amount, should be awarded and decreed to the Nebekers as
tributary to the main stream appropriated and used by them.

The cause is remanded, with directions to the trial court
to reopen the case and take further evidence along the lines
herein suggested, and to make findings of fact and conclu-
sions of law defining the rights of the respective parties to
the waters flowing from the wells, and enter a decree in har-
mony with and responsive to such findings of fact and con-
clusions of law, and to incorporate into the decree provisions
in accordance with the views herein expressed respecting the
seepage water intercepted and collected by plaintiff's drain
ditch, and the spring and seepage water, if any is shown to
exist, arising in the bed of the reservoir. The trial court is
further directed that unless plaintiff devises and adopts some
means of preventing the befouled reservoir water from seep-
ing, percolating, and finding its way into the stream used by
the Nebekers, or furnishes them at their ranch sufficient pot-
able water without expense to them for culinary and domes-
tic purposes, to incorporate into the decree a provision per-
petually restraining plaintiff from rebuilding and maintaining
the reservoir.

Appellants to recover their taxable costs on this appeal.

STRAUP, C. J., concurs.

FRICK, J.

I concur. I desire to add a few words, however, to what
Mr. Justice McCARTY has said. I fully approve the rule
laid down by this court that when a person comes into court
claiming that he has developed water he should be required
to establish his claim by clear and convincing proof, and if
he fails in that the court should deny his claim. In case,
however, the court is satisfied that the claimant has developed
some water under circumstances like those in this case, it
should, nevertheless, not award him a given per cent. of the
whole water which is claimed by the claimant and prior appro-
priators, as the trial court did in this case. Such a decree
may operate very harshly against the prior or original appro-

priator for the reason that it may well be that by the sinking of wells, or the driving of tunnels, etc., the flow of water may be increased for an indefinite period, and yet such increased flow may not be either continuous or permanent.  The court, therefore, should always be careful to first determine the quantity of water that a prior appropriator is entitled to, and, if the quantity varies in different seasons of the year, to determine it for each season, and should award him that quantity; and if the court is satisfied that there is developed water, it should enter a decree awarding to the claimant of developed water only the surplus over and above the quantity the original or prior appropriator is entitled to.  By doing that the court will always guard and protect the rights of the prior appropriator, and will be in a position to grant to the claimant all that he may be entitled to.  Of course the person who develops water should be protected in his rights the same as all others; but he should not be permitted to encroach upon the rights of the prior appropriator.  By following the course just outlined the rights of the original or prior appropriator as well as those of the claimant can always be protected.  Upon the other hand, if the water is divided by percentages, or by apportioning it into fixed quantities, the claimant may be awarded water from a flow that is not continuous nor permanent, and thus he may be awarded water at the expense of the original appropriator.

I am of the opinion, therefore, that in this case the district court should first find the quantity of water the appellants have used and are entitled to for all seasons and for all purposes, and if there is any excess water, such excess only should be awarded to the respondent, and the latter should not be permitted to use any water at any time, unless there is an excess over the quantity awarded to the appellants.

On Petition for Rehearing.

McCARTY, J.

Respondent has filed a petition for rehearing.  The only question presented by the petition relates to the taxation of the cost of printing appellant's brief and abstract.  Counsel for the respective parties to this appeal have filed briefs in

which the question presented by the petition is elaborately discussed, hence we do not deem it necessary to reopen the case for oral argument. We think the opinion heretofore filed in the case should be modified to the extent of relieving respondent of the payment of a portion of the cost of printing appellant's brief, but that the opinion in other particulars should remain undisturbed.

Appellant's first or original brief of seventy-four pages contains the equivalent of, at least, thirty-five pages of matter copied from the printed abstract. By a casual        **8** perusal of the brief in connection with the abstract it will be seen that the incorporating into the brief of the thirty-five pages of the printed abstract served no useful purpose whatever. It was merely a reabstracting of portions of the abstract and bill of exceptions, and was of no value or assistance whatever to this court in its review and consideration of the case. Respondent, therefore, ought not to be burdened with the cost and expense of the printing of the thirty-five pages of matter in the brief which is also contained in the abstract.

The order relating to the cost of this appeal is hereby modified by reducing the amount of the cost assessed against respondent in a sum equal to the cost of printing thirty-five pages of appellant's brief.

FRICK, C. J., and CORFMAN, J., concur.