# PETERSON et al. v. LUND.

No. 3478.   Decided November 29, 1920.   (193 Pac. 1087.)

1. WATERS AND WATER COURSES—SPRINGS MAY BE APPROPRIATED.
   The waters from flowing springs may be appropriated by ap-
   plying the same to beneficial use just as any other unappro-
   priated waters. [1]

2. WATERS AND WATER COURSES—COMPLAINT AND EVIDENCE SHOULD
   CLEARLY SHOW APPROPRIATION.  Where plaintiffs asserted that
   they were the original appropriators of the waters of a spring,
   and sought to enjoin defendant from operating an artesian
   well on his adjacent property on the theory that the flow of
   the well reduced that of the spring, although the complaint
   sufficiently alleges appropriation as against general demurrer,
   the evidence should clearly show the appropriation, and
   whether the rights were acquired by adverse user or by ap-
   propriation while defendant's property was still a part of
   the public domain.

3. WATERS AND WATER COURSES—PRIOR APPROPRIATORS SHOULD BE
   PROTECTED, BUT DEVELOPMENT OF NEW SOURCES SHOULD NOT BE
   INTERFERED WITH.  While prior appropriators of water should
   be protected, efforts to develop new and additional source of
   water supply should be encouraged by the courts, rather than
   discouraged.

4. WATERS AND WATER COURSES—EVIDENCE INSUFFICIENT TO ES-
   TABLISH THAT THE OPERATION OF WELL INTERFERED WITH
   PLAINTIFFS' SPRING.  Though plaintiff's were the original ap-
   propriators of the waters of a flowing spring which was fed
   by an artesian water basin, evidence of observations as to
   the flow of the spring and a well drilled by defendants in ad-
   jacent property held insufficient to show that the operation
   of the well interfered with the flow of the spring, and addi-
   tional measurements and fluctuations should be made, and the
   question whether other wells might cause fluctuations con-
   sidered.

5. COSTS—DIVISION OF COSTS ON APPEAL.  Where a judgment for
   plaintiffs, the original appropriators of the waters of a spring

---

[1] Sullivan v. Mining Co., 11 Utah, 438, 40 Pac. 709, 30 L. R. A.
186; Patterson v. Ryan, 37 Utah, 410, 108 Pac. 1118.

against defendant who drilled a well in the same artesian well basin, was reversed because of the insufficiency of the measurements made by the commissioners appointed by the court, costs should be divided.

Appeal from District Court, Seventh District, Sanpete County; *George Christensen,* Judge.

Action by Parley P. Peterson and another against Peter Lund. From a judgment for plaintiffs, defendant appeals.

REVERSED and REMANDED.

*Lewis Larson,* of Manti, for appellant.

*Bean & Hunt,* of Richfield, for respondents.

FRICK, J.

The plaintiffs, in substance, allege that at all times mentioned in the complaint and at the commencement of the action, they were the owners of certain lands in Sanpete county, Utah, describing them; that said lands were arid and without irrigation, sterile and nonproductive; that near the eastern boundary of said lands there were two springs, commonly known as the Shumway Springs, the waters of which the plaintiffs and their predecessors in interest had impounded and used for more than 30 years to irrigate said lands, and had, by the use of the water from said springs on said lands, produced crops and had improved the land by erecting valuable buildings thereon, etc.; that prior to the acts of the defendant, which are complained of, the plaintiffs and their predecessors in interest had used and appropriated all of the waters of said springs for the purposes aforesaid, stating the character and manner of the use of said water; that in August, 1916, the defendant "drove what is commonly called a 4-inch well" by driving a 4-inch pipe into the earth on his lands which adjoin plaintiffs' lands on the west, and by means of the well or pipe aforesaid tapped the "sub-

terranean current or flow which feeds and supplies plaintiffs' said springs and which draws * * * from said springs, and ever since has drawn from said springs, an artesian flow of water, which flow diminishes the flow from said springs, to plaintiffs' damage, etc. There were other material allegations, which, however, it is not necessary to set forth here. The plaintiffs prayed for an order permitting them to enter upon defendant's premises to make measurements of the water flowing from said well, prayed for a perpetual injunction and for general relief, with damages. The defendant interposed a general demurrer to the complaint, which was overruled. After the overruling of the demurrer the defendant filed an answer, in which, in effect, he denied all of the allegations of the complaint except that the springs existed as alleged. He denied, however, that said springs at any time or at all discharged in excess of .25 second foot of water. As an affirmative defense the defendant averred that he owned certain lands adjoining plaintiffs' land which, without water, are arid, sterile, and unproductive and that all of defendant's lands lie over an artesian water basin; that plaintiffs' said springs are ''to the east of defendant's land approximately one-quarter of a mile, and above defendant's said land, and the water feeding said springs this defendant is informed and believes, and therefore alleges, come from a stratum entirely different from that which feeds the defendant's well''; that the defendant drove said well to use the water flowing therefrom, and has used the same for domestic and irrigating purposes, and that the use thereof is necessary to produce crops on and for the full enjoyment of the benefits of his land. The defendant also prayed for affirmative relief. The plaintiffs, in reply, denied defendant's counterclaim.

It seems the court made an order appointing two commissioners to make measurements of the flow of the water from said springs and from defendant's well. Measurements were accordingly made, both when the well was sealed or closed and when it was flowing. The result of those measurements was as follows: The first measurement of the flow of the springs, it seems, was made on August 26, 1917, when the

well was closed. On that date, according to the measurement, the spring discharged .27 second foot of water. Another measurement was made on August 31st under the same conditions, when the springs discharged .26 second foot of water. These two measurements were followed by a series of six measurements of the springs with the well open and flowing. The first measurement was made on the 1st and the last on the 15th of September, 1917. The average discharge from the springs during that period of time was .20 second foot, or 89⅔ gallons per minute. The largest discharge was on the 1st of September, when it was .22 second foot, and the lowest was on the 15th, when the springs discharged .19 second foot. During the same period of time, commencing, however, on the 31st of August, 1917, eight measurements were taken of the flow from defendant's well. The average flow from the well during that period was .2125 second foot, the greatest flow being .24 second foot and the lowest .21. Other measurements of the springs with defendant's well open and flowing were taken as follows: Four measurements were made commencing February 27 and ending on April 14, 1918. These measurements, for some reason, were taken in cubic inches and gallons per minute. The average flow on the springs during the latter period was 292 cubic inches, or 76 gallons per minute. The greatest flow from the springs during this period was on February 27th, when, according to the measurements, the springs discharged 432 cubic inches, or slightly over 112 gallons per minute, and the lowest was on April 14th following, when the discharge was 243 cubic inches, or 63 gallons per minute. During the same period of time the same number of measurements were made of the flow from defendant's well. The average flow of the well was 367 cubic inches, or slightly in excess of 94 gallons per minute. The greatest flow from the well was on February 27th, when it amounted to 378 cubic inches, or slightly in excess of 98 gallons per minute, and the lowest was on April 14th, showing a flow of 360 cubic inches or a little over 73 gallons per minute. The defendant's well was then sealed, and two other measurements were made of the

flow of the springs. The first was made on April 30, 1918, when the discharge from the springs was 288 cubic inches, or a little in excess of 74 gallons per minute; and the second measurement was made on May 4th following, when the springs discharged 352 cubic inches, or a trifle over 92 gallons per minute.

The foregoing are all the measurements made by the plaintiffs. There was some other evidence produced on the part of the defendant, which was to the effect that, according to the investigations and a report made by one G. B. Richardson, in 1905, acting on behalf of the United States government, concerning the "Underground Water in Sanpete and Central Sevier Valleys, Utah," the Shumway Springs, that is, the springs in question, discharged water at the rate of 65 gallons per minute. In addition to that there was also some evidence on the part of the defendant to the effect that the springs at or about the time of the trial discharged 70 gallons per minute. There was also evidence that Mr. Tanner, a former state engineer of Utah, made measurements of the flow of water from the springs, which measurements showed a discharge of 78 gallons per minute. The latter measurements, it seems, were made some time preceding the trial.

The evidence is without conflict that defendant's well is 1,984 feet westerly from plaintiffs' springs; that the well is driven into the earth to a depth of 150 feet, and penetrates a stratum of sand and gravel for a distance of about 20 feet, and that the water flowing from the well comes from said stratum; that there is an artesian water basin underlying both the plaintiffs' and the defendant's lands; that said basin extends north of the springs about 20 miles and south thereof about 10 miles, east about 2,000 feet and west about 4 miles; that the artesian basin is therefore about 4 miles wide by about 30 miles in length and covers an area of approximately 120 square miles; that within that area there are "hundreds of flowing wells" known as artesian wells, some of them being to the north, some to the south, others to the east, and others still to the west of the springs; that some

of the wells to the north and northeast are much nearer to the springs than defendant's well; that while neither rain nor snow storms appeared to affect the flow from the springs, yet that the irrigation above and to the east of the springs during the latter part of the irrigation season, that is, during the months of July and August, did increase the flow of water therefrom; that plaintiffs and their predecessors in interest had used the waters of the springs for irrigation and domestic purposes for a period of more than 25 years; that such use was "open, notorious, continuous, uninterrupted, exclusive, and adverse."

The experts who testified both on behalf of plaintiffs and defendant gave it as their opinion that both the well and the springs were fed from the same source, namely, from the artesian water basin underlying the lands of both parties; that the artesian wells which were driven into the basin would tend to lessen the pressure of the water within the basin, and thus might, and probably did, affect the flow of the springs; that it was possible that defendant's well in that way affected the flow of the springs, but that there might be other wells which likewise affected the flow from the springs, which was a matter, however, which could not be affirmed with certainty.

The evidence also showed that the elevation at the point where defendant's well is located is about 12 feet lower than the elevation of the springs, and that if the well pipe were extended upwards the water would automatically flow from the pipe at an elevation of about 14 feet above the surface, or at an elevation of about 2 feet higher than the springs.

One of the witnesses for the plaintiffs who was authorized to make measurements of the flow from the springs also testified that the measurements were not absolutely accurate, and that he had made mistakes in his computations in determining the quantity of the flow. In that regard the court also found that, although the measurements were not "made as accurately as might have been desired," yet the measurements showed that the flow from defendant's well "diminished the flow of the springs."

Upon substantially the foregoing evidence the court found the issues in favor of plaintiffs, and, upon the findings, based its conclusions of law and entered judgment adjudging the flow from the springs to be .24 second foot of water, which quantity the court adjudged to the plaintiffs, and the defendant was enjoined from interfering with that flow.

Defendant's counsel assails the findings, the conclusions of law, and the judgment. While counsel, in his brief, does not contend that the common-law rule of percolating and seepage waters should control in this case, yet he insists: (1) That the doctrine governing the appropriation of water, which is first in time first in right, cannot be applied to this case; and (2) that in view of the artesian water basin which underlies all of the lands in question, and which, according to the evidence, must, for the purposes of this case, be taken to be the source of supply of plaintiffs' springs and of defendant's well, and of all other wells within the area of the artesian basin, for that reason either the rule known as the rule of "reasonable use" or the cognate rule of "correlative rights" should control in this case. The doctrine of reasonable use is thoroughly discussed in the following cases: *Katz* v. *Walkinshaw,* 141 Cal. 116, 70 Pac. 663, 74 Pac. 766, 64 L. R. A. 236, 99 Am. St. Rep. 35; *Barton* v. *Riverside Water Co.,* 155 Cal. 509, 101 Pac. 790, 23 L. R. A. (N. S.) 331; *Miller* v. *Bay Cities Water Co.,* 157 Cal. 256, 107 Pac. 115, 27 L. R. A. (N. S.) 772; *Ex parte Elam,* 6 Cal. App. 233, 91 Pac. 811; *Erickson* v. *Crookston, etc., Co.,* 100 Minn. 481, 111 N. W. 391, 8 L. R. A. (N. S.) 1250, 10 Ann. Cas. 843. Numerous other cases in which the doctrine of reasonable use, as well as that of correlative rights, is discussed, could be cited; but, in view that for the reasons hereinafter stated it is not our purpose at this time either to discuss or determine what rule should control in this case, we refrain from pursuing this subject further. In view, however, that the case must be remanded to the district court for further proceedings, it becomes necessary for us as a guide to that court to advert to the law of this state which controls the appropria-

tion and acquiring of rights to the use of water of streams and springs.

The facts in this case are beyond dispute that the springs in question constantly discharge, and for many years have discharged, a considerable quantity of water; that the springs always flowed, and continue to flow, a visible and open stream of water, which, under the law of this arid region always has been, and now is, the subject of appropriation, the same as any other unappropriated water from any visible and open stream or water course would be.   In view of the importance of the subject, all of the Legislatures, as well as all of the courts within the arid zones of this country, have not only recognized the right of appropriating the waters flowing from springs, but that right has been established and fixed beyond question.   Congress has also fully established and protected the right.   It is also well settled that in acquiring the right to the use of water flowing from springs the source of the water is not controlling.   That proposition has frequently been decided by the courts.   In *Le Quime* v. *Chambers,* 15 Idaho, 409, 98 Pac. 418, 21 L. R. A. (N. S.) 76, it is expressly held that it is not important ''whether the waters are from a well-defined subterranean stream or purely seepage or percolating waters.''   It was accordingly held in that case that where the waters appear on the surface in the form of springs, such springs are subject of appropriation precisely as any waters from any stream or water course would be.   In *Brosnan* v. *Harris,* 39 Or. 148, 65 Pac. 867, the law is stated thus:

"There is no difference in the right of appropriation between springs and running streams and the prior appropriator of the water of a spring will be as much protected as the appropriator of the waters of a stream."

In *McClellan* v. *Hurdle,* 3 Colo. App. 430, 33 Pac. 280, the law respecting the right of appropriation is very aptly stated in the following words:

"It is probably safe to say that it is a matter of no moment whether water reaches a certain point by percolation through the soil, by a subterranean channel, or by an obvious surface channel. If by any of these natural methods it reaches the point, and is

there appropriated in accordance with law, the appropriator has a property in it which cannot be divested by the wrongful diversion by another, nor can there be any substantial diminution. To hold otherwise would be to concede to superior owners of land the right to all sources of supply that go to create a stream, regardless of the rights of those who previously acquired the right to the use of the water from the stream below."

Our decisions are practically to the same effect. See *Sullivan* v. *Mining Co.*, 11 Utah, 438, 40 Pac. 709, 30 L. R. A. 186, and *Patterson* v. *Ryan*, 37 Utah, 410, 108 Pac. 1118.

In discussing the rule announced in the decisions of the foregoing cases it must be assumed that there was a legal appropriation. With respect to what constitutes a sufficient appropriation of water under the law in this jurisdiction, we refer to the case of *Sowards* v. *Meagher*, 37 Utah, 212, 108 Pac. 1112, and the cases there cited. If, therefore, the plaintiffs have appropriated the waters of the springs in question, and have used the same for a beneficial purpose, as those terms are commonly understood and applied, then plaintiffs would have acquired a right to the use of the waters flowing from the springs which could not be interfered with without their consent. Under such circumstances the rights of the plaintiffs in the use of the waters flowing from the springs would be protected in a court of equity, and any interference therewith would be enjoined. The record in this case presents a situation, however, which has not heretofore been presented or passed on in any other case in this jurisdiction, and for that reason, as well as for others, we are loth to determine and to permanently fix the rights of the respective parties respecting the waters in question, or to lay down any hard and fast rule governing cases, where the facts and circumstances are as they appear from the record in this case, without being fully advised with respect to all the circumstances which may affect the result.

The plaintiffs in their complaint did not, at least not in the usual and ordinary manner of pleading, allege the appropriation of the waters flowing from the springs. While it is true that they allege that they have used the water, etc., yet counsel for defendant vigorously insists that the allega-

tions of the complaint, and the evidence produced by the plaintiffs in support thereof, when considered together, are insufficient to justify a finding of appropriation of water under our law. While we are of the opinion that the allegations of the complaint are sufficient to withstand a general demurrer, yet, in view of the importance of the case, we are constrained to hold that the evidence respecting the appropriation of the waters flowing from the springs should be made more specific and certain. No doubt if plaintiffs "impounded" the waters flowing from the springs and commenced using it for a beneficial purpose while the lands upon which the springs are located and the defendant's lands were still a part of the public domain, or if plaintiffs obtained the right to use the waters from any one who so appropriated them, or if they have acquired the right by reason of adverse user, as that term is generally understood, after the lands aforesaid ceased to be a part of the public domain, then the right of the plaintiffs may well be held to be unassailable from any source. The foregoing conditions are, however, not made to appear as clearly as we should like to have them. Neither is any one of such conditions so made to appear. No doubt with but slight effort on the part of the plaintiffs all or some of them can be so made to appear. In view, therefore, that the case will have to be remanded for further proceedings, we suggest that plaintiffs be required to produce evidence showing when the waters from the springs were first put to a beneficial use, and whether at that time the lands on which the springs are located and also the lands on which the well is located were still a part of the public domain. In short, let the plaintiffs be required to present all the evidence concerning the use and the right to the use of the waters from said springs from the inception of such use, as well as the circumstances and conditions regarding its use. Then let the court make specific findings respecting those matters so that there can be no question regarding them.

Neither are we satisfied of the correctness of the measurements that were made respecting the quantity of water flow-

ing from the springs. While it is of the utmost importance in this arid region that every person who has acquired a prior right to the use of water for beneficial purposes be sacredly protected in that right, yet it is of equal importance that the right to develop all available sources of water supply should likewise be protected, and that in connection therewith the efforts to develop new and additional sources of water supply be encouraged by the courts rather than prevented, unless existing rights are affected in some substantial degree by such efforts and development. Where, therefore, it is asserted, as it is in this case by plaintiffs, that the defendant is interfering with their prior rights in certain waters the source of which is found in a subterranean natural storage basin, and it is insisted by the defendant that there is no such interference, the evidence on the part of the plaintiffs should be made as certain and as clear as the circumstances will permit to authorize a permanent injunction against the defendant. Where the circumstances are such that it is possible only to establish the probable existence of a material fact, the courts are frequently required to base their findings of the ultimate or controlling facts upon such probabilities merely. So far as the flow of water is concerned in this case happily no such a contingency exists. Here, by applying well known and approved methods of measurements, with only ordinary care and effort, by either one or more competent persons, certainly an approximately exact flow of the quantity of water from the springs at any particular time can be ascertained. By making such measurements over a sufficiently long time it also can be ascertained how and to what extent the flow from defendant's well affects the flow from the springs. In that connection care should also be exercised that all of the causes which may affect the flow from the springs are considered and given due effect. If there are other wells near plaintiffs' springs, as the evidence discloses, their effect, if any they have, on the flow from the springs should be carefully considered and weighed.

We feel constrained to make the following observations for

the reason that in our judgment none of the precautions just stated were taken: It will be observed from the measurements as given that the flow from the well fluctuated precisely as the flow from the springs, although not to the same extent. That the fluctuations respecting the flow from the springs might be attributed to natural conditions a moment's reflection will make clear. If it be assumed that the source of the water which comes from the springs is in the subterranean water basin the same as that which flows from the well, then, in view that the waters from the springs must force their way through the earth to the surface while the waters flowing from the 4-inch pipe constituting the well would flow to the surface without obstruction, it is easy to understand why the fluctuations in the flow from the springs would be more irregular and perhaps subject to greater changes than that of the well. Then again, the evidence discloses that plaintiffs have impounded the waters flowing from the springs by throwing a dike around the springs which forms a small pond of about 10 or 12 feet in width by about 20 feet in length and a number of feet in depth. The water which is discharged from the springs therefore enters the bottom of this small pond, and any one can readily understand why it is more difficult to make an exact measurement of the flow of the springs than it would be to do so from the well. This conclusion is, we think, justified from the measurements themselves. For example: On February 27, 1918, according to the measurements made on behalf of the plaintiffs, the spring flowed 432 cubic inches, or slightly over 112 gallons per minute, while on March 15th following, according to the measurement, the springs flowed only 252 cubic inches, or a little over 65 gallons per minute. The well remained open and flowing during this period of time. Upon the other hand, the well, on February 27, 1918, showed a flow of 378 cubic inches, or a little in excess of 98 gallons per minute, while on March 15th following it had a flow of 360 cubic inches, or a little over 93 gallons per minute. There is thus a much larger fluctuation shown in the flow of the springs than there is in the well. While the fluc-

tuations on the other measurements are not so pronounced, yet they always exist. There are still other discrepancies that exist, but which the limits of this opinion forbid us to enlarge upon. The differences in the foregoing measurements show that either the flow of the springs is far more irregular than that of the well, or that the measurements from the springs were not as accurate as they should have been, and therefore do not justify a permanent injunction against the defendant. Notwithstanding these fluctuations, and that the average flow from the springs was less than .24 second foot, the court, nevertheless, awarded that amount to the plaintiffs permanently, and in case the springs do not discharge that quantity of water the defendant is required to seal his well, and he is required to do that although the well might not be the only cause of the fluctuations and discrepancies in the flow of the springs.

In view of the foregoing we are not satisfied that the judgment should prevail, for the reason that the measurements of the flow from the springs were not made with that degree of care and accuracy with which they should have been made, and can be made. It is obvious that the measurements of the flow of the water from the springs is not a matter which must be left to the mere judgment of any one, much less to conjecture; but the flow can be determined and fixed to a reasonable degree of certainty. That being so, it should be made as certain as possible by the exercise of reasonable care and effort. In this case at the very best there will be a number of matters which ultimately must be left to the judgment of experts and to those whose duty it will be to determine the respective rights of the parties. That being so, no conjecture should be indulged with respect to matters which, by reasonable effort and care, can be made certain. The district court should therefore appoint at least two competent persons to make measurements of the flow from the plaintiffs' springs and from the defendant's well. Such measurements should be made according to such methods and over such a period of time as will most likely result in ascertaining the

accurate flow of water from the springs with the well open and also with it sealed.

In addition to the foregoing the court should also satisfy itself from competent evidence whether there are other wells or other causes in the vicinity of plaintiffs' springs which may affect the flow thereof, and, if so, to what extent, and make proper findings, to the end that when final judgment is entered in this case it may be based upon all the facts and circumstances which may affect the rights of the parties.

The findings of the court and the conclusions of law are therefore set aside. The judgment is reversed, and the cause is remanded to the district court of Sanpete county, with directions to proceed with the case and to dispose of it in accordance with the views stated in this opinion.

In view of the whole record we feel constrained to hold that the costs of this appeal should be equally divided between the parties. Such is the order.

CORFMAN, C. J., and WEBER and THURMAN, JJ., concur.

GIDEON, J.

I concur in the order reversing the judgment and remanding the cause for further proceedings. I doubt, however, whether the additional information desired will be of much, or any, assistance to the court in determining the rights of the parties. As stated by Mr. Justice FRICK, "There is an artesian water basin underlying both the plaintiffs' and defendant's lands," and it appears from the testimony that the waters claimed by both the plaintiffs and the defendant come from this artesian basin. It also appears without dispute that the waters obtained or acquired by the defendant in driving the well complained of were exclusively used in the irrigation of defendant's lands, a necessary and beneficial use. I therefore withhold any concurrence in, or expression concerning, the ultimate rights of the parties to the use of the waters in question.