343 P.2d 1100

N. M. LONG & COMPANY, a corporation, and Maggie J. Smith, Plaintiffs and Appellant,

R. Kay Mower and Mrs. M. H. Mower, Plaintiffs in Intervention and Appellants,

v.

CANNON–PAPANIKOLAS CONSTRUCTION COMPANY, a partnership, Edward Holmes, and Grant Jensen, Defendants and Respondents.

No. 8999.

Supreme Court of Utah.

Sept. 17, 1959.

Mark, Johnson, Schoenhals & Roberts, Salt Lake City, for appellants.

Ray, Rawlins, Jones & Henderson, Salt Lake City, for respondent.

CROCKETT, Chief Justice.

The plaintiffs sued for damages and for injunctive relief based upon the claim that the defendants in draining and conditioning their land had drained water from the adjoining lands of the plaintiffs. From adverse judgment the plaintiffs appeal.

The attack upon the judgment poses these questions: (1) Does the evidence compel a finding that the draining of the defendants' land caused loss of water from the land of the plaintiffs; and (2) if so, can the defendants be held liable for damages caused thereby.

The properties of the parties here involved are located near Holladay, a suburb of Salt Lake City (general location point: 5100 South, 1500 East). They lie on the pediment of the Wasatch Mountains on the east side of Salt Lake Valley. The drainage from the snows and storms in the mountains is westward. Some of it courses through underground aquifers into the valley, part of which surfaces in springs and seeps in the properties in question.

The defendants are in the business of developing and constructing residential subdivisions. In 1953 and 1954 they acquired approximately 92 acres of land in that locality. The greater portion of it being swampy, they caused drains to be installed to lower the water table to condition the land for their purpose. It is this which the plaintiffs claim had the effect of draining the water from their lands and depleting their water sources.

Plaintiffs Mower own approximately seven acres lying southeast of the defendants' property, upon which there is a pond which was originally created by Grandfather Mower in 1883. It has been since used for propagating fish and for recreational purposes. There is evidence that at some times a substantial income was made therefrom.

The Mower Pond also serves as a reservoir. At its lower (west) end is a headgate to regulate the flow of water therefrom which runs into what is called the Long Ditch. It courses northwesterly, carrying about two second feet of water normally, to the properties of plaintiffs Maggie Smith and of N. M. Long and Company. The former has a tract of about six acres which has been used for truck gardening and farming; the latter has about 17 acres which has been used for farming and also supports an orchard and vineyard.

The plaintiffs have established rights to the beneficial use of the waters in and flowing from the Mower Pond. Their evidence indicates that since the installation of the defendants' drains, there has been a substantial diminution of water in the pond, and flowing therefrom. Nevertheless, upon the whole evidence the trial court remained unconvinced that the installation of the defendants' drains was the cause of the depletion of the plaintiffs' water, and also held that the defendants had done no wrongful act in conditioning their land to make it useful.

Assuming for the moment that the evidence would compel a finding that the defendants' drains had the effect of depleting the plaintiffs' water supply, we set aside the controversy over that issue to consider the more fundamental question as to the defendants' right to use their property even though it may have an adverse effect upon the water table in the lands of plaintiffs.

It is to be borne in mind that this is not a case dealing with competing claims to the propriety use of water. The defendants are not seeking to appropriate water to which the plaintiffs had previously established rights to use. If it were so, the plaintiffs as prior appropriators would own the right to the use of the water and such rights would be entitled to protection.[1] The situation here is significantly different; any effect the draining of defendants' land had upon the water available to the plaintiffs resulted as an incident to the defendants' efforts to make their own lands suitable for use. The question is: Are they obliged to let their lands remain in a swampy condition to provide support to underground waters to make them available to adjoining landowners.

■ It is generally considered to be axiomatic that the right to own property includes the right to make reasonable and ordinary uses thereof even though it may incidentally cause damage or unavoidable loss to another. Such damage or loss is said to be damnum absque injuria.[2] But it requires little imagination to realize that rights to use property cannot be absolute.

1. Wrathall v. Johnson, 1935, 86 Utah 50, 40 P.2d 755; Justesen v. Olsen, 1935, 86 Utah 158, 40 P.2d 802.

2. See 1 C.J.S. Actions § 15, p. 1008.

If one holds property by force alone he is always subject to being dispossessed by force. If he holds it by rule of law this involves the agreement of everyone else. To the extent they are required to respect his rights, he must similarly respect theirs.

 As populations continue to increase and society becomes more complex, pressures increase in connection with the use of land and resources. The consequence of this is greater necessity for restrictions upon the manner in which property rights may be exercised. Just as the right to hold, use and enjoy property is by the collective consent of society, as represented by the law, the law within its proper limits may also impose such controls thereon as are necessary in the interest of the common welfare. One cannot demand of collective society to be protected in his ownership of property, and refuse to be bound by the conditions it sets upon which it will safeguard such ownership. The rights and duties are reciprocal and the enjoyment of property is confined within a framework limited by the rights of others as sanctioned by the law under principles of public policy.

 This case is a good illustration of the difficulty which arises when property owners attempt to so regard their rights and extend them to the limit. The plaintiffs assert an absolute right to the possession and use of subterranean waters and in insisting upon maintaining it unimpaired, attempt to extend controls over the defendants' rights to use of their lands; on the other hand, the defendants insist upon the right to put their land to normal and ordinary uses even if it impairs the plaintiffs' claimed rights. When conflicts of this character arise it is necessary to give consideration to the basic purposes for which property is possessed as established by the customs and practices of people in the use of property of similar character. It is the policy of the law to recognize the propriety of such uses and encourage the improvement of property so that it may be put to its best advantage. It is apparent that the trial court regarded it as necessary for the defendants to take the measures they did to accomplish that purpose. That being so, under well-established principles of law relating to interference with underground waters they would incur no liability unless they (1) wilfully or intentionally interfered with the plaintiffs' water; or (2) were negligent or reckless with respect thereto in installation of their drains.[3]

 The plaintiffs as the moving parties have the responsibility of demonstrating their rights to recover under the principles just stated. It is true that the de-

3. See Restatement of Torts IV, Secs. 822 to 840, and 849; also Annotation 29 A.L.R.2d, p. 1365.

fendants should have been aware that the Mower Pond was fed by springs and water percolating in the soil. But the defendants' land which lies north of the pond, is only slightly lower than the Mower property. The ground level of their subdivision is approximately 11 feet lower than the bottom of the pond; and the nearest drain is some 350 feet from it. Under the facts shown as to the drainage of the whole area the defendants were not obliged to anticipate that the drainage of their land would result in reducing the waters available to the plaintiffs.

There is some evidence of conversations indicating that the defendants were warned of the likelihood that draining their property might result in adversely affecting plaintiffs' water supply. But the evidence is in conflict as to the import of such conversations. We do not regard it as making imperative a determination by the trial court that the defendants wilfully or intentionally depleted the plaintiffs' water supply, nor that they were negligent or reckless with respect thereto in installing their drains.

We are in accord with the view taken by the trial court that under the circumstances the defendants did not have to let their land remain in a swampy condition for the purpose of protecting underground waters of adjoining lands. They were entitled to make ordinary and reasonable uses of their property so long as they did so with due care and not in violation of the principles herein set forth. In addition to being a sensible recognition of defendants' rights to make such use of their property, this conclusion accords with the salutary public policy of encouraging the development of property for useful purposes. The benefits of a residential subdivision as compared with the maintenance of a swamp need hardly be pointed out.

█ Our resolution of the issue as to defendants' right to use their property renders moot the question whether the trial court erred in refusing to find that the draining of the plaintiffs' property was the cause of the lowering of the water table and the depletion of the plaintiffs' source of water.

Affirmed. Costs to defendants (respondents).

McDONOUGH, J., and MERRILL C. FAUX, District Judge, concur.

HENRIOD, J., concurs in result.

WADE, Justice (dissenting).

If the evidence would compel a finding that defendants' drains had the effect of depleting plaintiffs' water supply, as I think it would, then in my opinion plaintiffs were each entitled to damages therefor. I will first consider the question of whether plaintiffs are entitled to damages after

a brief statement of some facts which should be kept in mind during this discussion. Then I will discuss whether the evidence would compel a finding that defendants' drains depleted plaintiffs' water supply.

Each of the three plaintiffs established an adjudicated right by appropriation and beneficial use of the waters which accumulated in the Mower Pond and the Long Ditch. This water was diverted into this pond and ditch by artificial drains and ditches of natural springs and swampy grounds of higher elevation to the southeast. This water had been beneficially used by the plaintiffs and their predecessors since 1886 and 1883 and earlier according from the trial court's findings. The trial court also found that the water from these springs and swampy grounds was "sustained and supplied from water escaping by seepage from Big Cottonwood Creek and seepage of water resulting from irrigation of" high elevation grounds. The Mower Pond and Long Ditch are both on grounds of higher elevation than the defendants' subdivisions, which are north of the pond and northeast of the Long Ditch. The defendants' drains are placed underground in its subdivisions.

They do not intercept the water before it reaches the Mower Pond, the Long Ditch or the springs and swamps which feed them. So the only way that these drains could decrease plaintiffs' water would be by lowering the water table or level of the water, or static head pressure under the Mower Pond and the Long Ditch, and the springs and swampy ground from which the water supply was drained by draining the water from below through the porous sand and gravel formation under the pond, ditch, springs and swampy ground so that this water would flow or seep directly underground to defendants' drains without coming to the surface at such pond, ditch and drains as it did before the drains were put in.

This court has uniformly protected an appropriation of water against the acts of another which had the effect of lowering the water table or static head pressure of underground waters, or the level of the flow of a stream, or the waters of a lake at the point of diversion and thereby interfering with the right of such appropriators to the use of an established water right. This is true whether the water was brought to the surface by means of artesian wells,[1]

1. Horne v. Utah Oil Refining Co., 1921, 59 Utah 279, 202 P. 815, 31 A.L.R. 883; Glover v. Utah Oil Refining Co., 1923, 62 Utah 174, 218 P. 955, 31 A.L.R. 900; Wrathall v. Johnson, 1935, 86 Utah 50, 40 P.2d 755; Justesen v. Olsen, 1935, 86 Utah 158, 40 P.2d 802; Hanson v. Salt Lake City, 1949, 115 Utah 404, 205 P.2d 255; Little Cottonwood Water Co. v. Sandy City, 1953, 123 Utah 242, 258 P.2d 440.

by natural or developed springs and seepage waters,[2] or by lowering the level of a lake.[3]

The above decisions in a sense involved competing claims to the beneficial use of water from the same source. However, in many of the cases there was enough water to satisfy both claims, but the drawing of the water of the subsequent claimant from the same source as the prior claimant lowered the static head pressure so that pumping was necessary, which raised the question of who should bear the cost of pumping. In the case of Kano v. Arcon Corporation,[4] the defendants, the same as in this case, were not seeking to appropriate or beneficially use the water which they drained out of their land, thereby making unavailable to plaintiffs the use of the water by gravity flow which they had previously appropriated to a beneficial use. The defendants in that case, the same as in this one, placed underground drains in their own swampy ground to drain the water out and lower the water table or static head pressure and thereby make their own ground suitable for subdividing and building homes thereon. Incidentally, in both cases the static head pressure of the water was lowered so that the water which plaintiffs had previously appropriated to a beneficial use was made unavailable to plaintiffs without pumping. The prevailing opinion attempts. to distinguish this case from Wrathall v. Johnson and Justesen v. Olsen,[5] because defendants are not seeking to appropriate water which plaintiffs have established the right to use, but are merely seeking to make their own land suitable for use as building lots. No attempt, however, is made to distinguish the Kano case or overrule it, and. no mention is made thereof.

Generally the facts are similar in the two cases, but there are some differences. In the Kano case the defendants directly destroyed ponds and ditches on defendants' land through which plaintiffs had a right of way, and had conveyed their water from a natural stream and swampy ground to their own farm. Thus obviously defendants' actions in destroying such ponds and ditches deprived plaintiffs of their water supply by gravity flow. In this case defendants did not directly interfere with plaintiffs' ponds, ditches or drainage system, but by drains in their own lands below

2. Sullivan v. Northern Spy Min. Co., 1895, 11 Utah 438, 40 P. 709, 30 L.R.A. 186; Herriman Irr. Co. v. Keel, 1902, 25 Utah 96, 69 P. 719; Bastian v. Nebeker, 1917, 49 Utah 390, 163 P. 1092; Peterson v. Lund, 1920, 57 Utah 162, 193 P. 1087; Peterson v. Wood, 1928, 71 Utah 77, 262 P. 828.

3. Salt Lake City v. Gardner, 1911, 39 Utah 30, 114 P. 147.

4. Kano v. Arcon Corporation, 1958, 7 Utah 2d 431, 326 P.2d 719.

5. See note 1 above.

plaintiffs' lands they lowered the static head pressure so that the water which would have come to the surface and filled plaintiffs' pond and ditches was drawn underground through plaintiffs' land into defendants' drains. I do not claim that defendants were not entitled to improve their property as they did, but I think they should be required to pay plaintiffs damages for depriving them of their water rights. The only distinction between this case and the Kano case is that there the defendants intentionally destroyed plaintiffs' ditches and ponds and drained the water table down to a lower level, whereas here it is not so evident that plaintiffs' water rights would be destroyed by the drainage of defendants' lands. I do not agree that this slight difference is sufficient to justify us in requiring the plaintiffs in the Kano case to pay defendants' damages but refusing to do the same in this case. Here, as in the Kano case, the defendants drained their land in order to make it usable for building purposes. The only difference in the two cases is that here the defendants were not so sure that such drainage would destroy the plaintiffs' water rights. Such fine distinction does not seem to me to justify the difference.

The prevailing opinion cites only the Restatement of the Law of Torts, Vol. IV, Secs. 822 to 840 and 849 in support of its conclusions. That authority repeatedly points out, in the sections cited[6] and other sections under the same topic,[7] it is considering only riparian rights, and no attempt is made to deal with the law of prior appropriation which prevails in this state.[8]

I think the evidence requires a finding that defendants' drains depleted plaintiffs' water supply and that a contrary finding would be unreasonable. The trial court made no direct finding on this question. It did find that there "had been a decrease in the amount of seepage waters which came to the surface * * * but not by any wrongful act of defendants."

Whether defendants' drains depleted plaintiffs' water supply, since it all happened underground was not a subject for direct eye witness testimony, but is largely a question for expert opinion. Plaintiffs' expert, Mr. Ward, is a ground water engineer of many years' experience with this and similar problems. He has lived in this neighborhood for many years, has worked in the State Engineer's office and for Salt Lake City, and in both capacities has investigated this situation. He has kept records on the water flow and made investigations of the water table in the neighborhood of plaintiffs' pond and ditches, has

6. See Restatement of the Law of Torts, Vol. IV; this is pointed out in the comment to 849, pp. 340 and 341.

7. See Restatement, Sec. 843, where "Riparian Lands" are defined and discussed.
8. See Restatement, Sec. 849, end of paragraph at top of page 341.

driven perforated pipes into the soil, determined the nature of the underground strata of the country, and made charts of the results of his investigations. He gave it as his firm and positive opinion, claiming that his investigations demonstrated that the defendants' drains did lower the water table or static head pressure of the grounds where their water was diverted into their systems and depleted their water supply.

There is no evidence to the contrary. Mr. Papanikolas, a partner in the Cannon-Papanikolas partnership, suggested that the sewer which was installed in Highland Drive about the same time as defendants' drains, was the cause of plaintiffs' water supply depletions. Mr. Heath, a civil engineer and land surveyor with some experience in drainage, installed defendants' drains, but he neither qualified to nor expressed any opinion contrary to Ward's opinion.

On rebuttal Ward testified that the Highland Drive sewer was at least a thousand feet east of the Mower Pond, the nearest part of plaintiffs' system to that sewer; that the sewer is 15 feet higher in elevation than the pond, and that at one point plaintiffs' ditch is as near as 50 feet to defendants' sewer. He testified that the sewer is a sealed pipe so that water from the outside cannot enter it. The sewer pipes were laid on a sand and gravel base with large concrete manholes every few hundred feet, with the bottom a few feet lower than the sewer pipes, and the concrete was poured on the native ground, thus preventing water on the outside of the sewer from seeping through the gravel base beyond the manholes. He gave it as his opinion that only a small trickle of water could escape along the outside of the sewer, and that in view of the higher elevation of the sewer than plaintiffs' water system, the long distance they are apart, the sealed sewer pipes which prevented the water from entering from the outside, and the manholes every few hundred feet with concrete poured on the native soil under the sewer, the waters which feed plaintiffs' system could not have escaped along this sewer. The record contains no substantial evidence to the contrary. I think it would be unreasonable to find from this evidence that defendants' drains didn't deplete plaintiffs' water supply.