HOLMAN et al. v. CHRISTENSEN.

No. 4650.   Decided January 7, 1929.   (274 p. 457.)

390

*LeRoy B. Young*, of Ogden, for appellant.

*B. C. Call*, of Brigham City, for respondents.

HANSEN, J.

The defendant prosecutes this appeal from a decree quieting title in plaintiffs to all of the waters which arise from springs, seepage, and percolation upon plaintiffs' lands. The plaintiff James I. Holman is the owner of 48.92 acres of land, and the plaintiff W. S. Christopherson is the owner of 21.69 acres. The lands of plaintiffs are adjacent. The Christopherson land is north of the Holman land. Defendant is the owner of 40 acres of land lying immediately to the west of plaintiffs' lands. A lane or road extends north and south between the lands owned by plaintiffs and the land owned by defendant. The lands are located a short distance west of Brigham City in Box Elder county, Utah. The defendant's land is lower than plaintiffs' lands, and hence the water which arises on plaintiffs' lands flows and seeps, when not interefered with, down towards and onto defendant's land. Plaintiffs base their claim to the waters involved in this proceeding in part upon the alleged appropriation thereof by their predecessors in title and partly upon the alleged development of such water by plaintiffs in draining their lands. The defendant bases his claim to the water in dispute upon an alleged appropriation thereof by his predecessors in title.

Defendant has filed 36 assignments of error upon which he relies for a modification or a reversal of the decree appealed from. The principal ground of complaint, however, is that the evidence does not support the findings of fact and decree.

This being a suit in equity it is our duty to examine the evidence and determine its weight, bearing in mind the rule so frequently announced by this court that the trial court's findings of fact should not be disturbed unless we are of the opinion that they are against the clear preponderance

of the evidence. The witnesses who testified in this case are so numerous that it would extend this opinion beyond reasonable limits to recite even the substance of the testimony of each of the various witnesses. Plaintiff called 18 witnesses. Likewise 18 witnesses testified on behalf of defendant. We shall therefore confine our discussion of the evidence to general observations.

From time immemorial small streams of water from springs, seepage, and percolation have arisen on the easterly end of the lands owned by plaintiffs. As a result of this water much of plaintiffs' lands have been, before the same were drained, wet and swampy. A pond variously described by the witnesses as being from $\frac{1}{2}$ to $1\frac{1}{2}$ acres in area has stood upon plaintiffs' premises. Some of this water, before it was interefered with, flowed to the west through swales or natural water channels down onto defendant's land. The evidence does not disclose when the lands now owned by the plaintiffs came into private ownership. A patent issued from the United States to the predecessors in title of the defendant under date of January 10, 1885. The evidence shows that as early as 1870 the lands now owned by plaintiffs and defendant were occupied and claimed by their predecessors in title. About 1880 these lands were inclosed within fences. At about the time the lands were fenced a road extending along the north side of the Christopherson property was improved. A ditch or borrow pit was constructed along the entire south side of the road paralleling it, and near the northern boundary line of the Christopherson property. After this ditch or borrow pit was constructed the water from the springs, which were located on plaintiffs' lands, was diverted into such ditch or borrow pit. According to defendant's evidence, the water continued for a number of years to course down this ditch or borrow pit to the southwest corner of the Christpherson property, and was then diverted in a southwesterly direction onto defendant's land. Without conflict, the evidence shows that at some time before this suit was

begun a dam was placed in the ditch or borrow pit at a point about midway between the eastern and western boundary of the Christopherson property. This dam diverted the water back onto the property now owned by plaintiffs. There is a conflict in the evidence as to the date when this dam was placed in the ditch or borrow pit. According to defendant's evidence, it was placed there only a few years before this suit was begun. According to plaintiffs' evidence, the dam was placed in the ditch or borrow pit and the water diverted back onto plaintiffs' lands at some time prior to 1892. It further appears from the evidence that at the time the dam was placed in the borrow pit or ditch the water was diverted into a ditch which was constructed on plaintiffs' lands. This ditch into which the water was diverted extended south and thence westerly down towards the land now owned by defendant. According to the testimony of some of plaintiffs' witnesses, this water, or a part thereof, was used to irrigate the westerly part of plaintiffs' lands. According to the testimony of defendant's witnesses, there was no appreciable diminution of water which reached defendant's land until some years after the plaintiffs put in their drainage system.

The plaintiffs became the owners of their lands in 1904. At that time some of the lands along the easterly end were broken up and used to raise agricultural crops. The western part had not been broken up or otherwise improved, but was being used for pasturage and the raising of native grasses for hay. In 1905 plaintiffs began to construct drains on their lands. Drain pipes were laid in some of the drains, and some of the drains were left open. Plaintiffs continued the work of draining their lands to, and including, the year 1907. The draining of plaintiffs' lands increased the flow of water, as found by the court, 100 per cent. The plaintiffs also broke up and brought into cultivation most of the westerly part of their lands. The water which was collected in the drain pipes was used by the plaintiffs to irrigate the lands thus brought into cultivation.

Some of the water was also used on the westerly part of plaintiffs' lands which was not in cultivation.

According to the testimony of plaintiffs and some of their witnesses, all of the water collected in their drain pipes during the irrigation season was used upon their lands. The defendant and some of his witnesses testified that the water continued to flow onto his land during the irrigation season until two or three years before this suit was begun.

At the outset, counsel for the parties to this proceeding seem to differ upon the question of whether or not the water involved in this proceeding is such water as is subject to appropriation by any one other than the ■ owner of the land upon which the water rises. The law is well settled that water flowing from a spring located upon the public domain may be appropriated at its source as well as after it flows into a natural water channel, and that a right acquired by appropriation is not defeated when the land passes into private ownership. *Geddis* v. *Parrish*, 1 Wash. 587, 21 P. 314; *De Necochea* v. *Curtis*, 80 Cal. 397, 20 P. 563 (upon rehearing see 22 P. 198) ; *Williams* v. *Harter*, 121 Cal. 47, 53 P. 405; *Silver Peak Mines* v. *Valcalda* (C. C.) 79 F. 886; *La Quime* v. *Chambers*, 15 Idaho 409, 98 P. 418, 21 L. R. A. (N. S.) 76; *Broshan* v. *Harris*, 39 Or. 148, 65 P. 867, 54 L. R. A. 628, 87 Am. St. Rep. 649; *Rait* v. *Furrow*, 74 Kan. 101, 85 P. 934, 6 L. R. A. (N. S.) 157, 10 Ann. Cas. 1044; *Orient Mining Co.* v. *Freckleton*, 27 Utah 125, 74 P. 652; *Ranch Co.* v. *Argile*, 28 Utah 398, 79 P. 47.

In this jurisdiction a vested right may be acquired to percolating water on the public domain. *Sullivan* v. *Northern Spy Mining Co.*, 11 Utah 438, 40 P. 709, 30 L. R. A. 186; *Snake Creek Mining & Tunnel Co.* v. *Midway* ■■ *Irr. Co.*, 260 U. S. 596, 43 S. Ct. 215, 67 L. Ed. 433; *Peterson* v. *Wood* (Utah) 262 P. 828. It is also settled law that one who acquires title to public lands does not thereby acquire title to water flowing in a natural channel on such lands from springs located thereon. Spring water which

flows in a natural channel off a tract of land is subject to appropriation, although at the time of the appropriation the tract of land upon which the spring is located is in private ownership. *Gutierrez* v. *Wege*, 145 Cal. 730, 79 P. 449; Id., 151 Cal. 587, 91 P. 395; *Southern California Inv. Co.* v. *Wilshire*, 144 Cal. 68, 77 P. 767; *Barneich* v. *Mercy*, 136 Cal. 205, 68 P. 539; *Chandler* v. *Utah Copper Co.*, 43 Utah 479, 135 P. 106; *Peterson* v. *Lund*, 57 Utah 163, 193 P. 1087; *Big Cottonwood Lower Canal Co.* v. *Cook* (Utah) 274 P. 454. A different rule has been applied when the spring first appears after the title to the land has passed into private ownership. *Willow Creek Irr. Co.* v. *Michaelson*, 21 Utah 248, 60 P. 943, 51 L. R. A. 280, 81 Am. St. Rep. 687. It follows that the spring water which flows in a natural water channel from the plaintiffs' lands onto defendant's land was subject to appropriation by any person who could put the same to a beneficial use whether the lands upon which the springs were located were a part of the public domain or had passed into private ownership.

The evidence in this case is somewhat unsatisfactory as to whether or not any water flowed in a natural channel off plaintiffs' land before the drains were constructed. Apparently the parties to this suit did not regard such fact of controlling importance. The pleadings and the trial proceeded upon the theory that the spring water involved in this controversy was originally public water, and, as such, subject to appropriation. The cause having been tried upon such theory, we are not at liberty to dispose of it upon some other theory. It should be observed that we do not here hold that water arising from springs on private land and flowing off such land in a manner other than through a natural channel is subject to appropriation.

It is suggested, but apparently not seriously contended, on behalf of the plaintiffs that none of the water which came to the surface on plaintiffs' lands has its source in springs as the term springs is understood and used

in the law relating to the appropriation of water. Springs are defined in 1 Kinney on Irrigation & Water Rights (2d Ed.) § 313, page 511, in the following language:

"Springs may be defined as those places where water issues naturally from the surface of the earth. * * * No matter how small the stream flowing from a spring if it flows with some degree of regularity in a well defined channel it is a water course."

The evidence in this case shows that from time immemorial there have been springs, as above defined, located on plaintiffs' lands. The plaintiffs alleged in their complaint, and the trial court found, that

"there is, and from time immemorial has been, small streams of water arising from two or more springs, seepage and percolation at various places on the lands owned by plaintiffs."

It is further urged on behalf of the plaintiffs that the evidence does not show that any of the spring water from plaintiffs' land flowed down onto defendant's land. A careful examination of the record convinces us that the great preponderance of the evidence shows that before the plaintiffs drained their lands water almost continuously flowed from the lands now owned by plaintiffs down onto the land owned by defendant. Of course all of the water which flowed from plaintiffs' lands onto defendant's land was not spring water. The spring water of necessity commingled with, and was augmented by, surface seepage and percolating waters, but that some of the spring water from plaintiffs' lands flowed down onto defendant's land before the springs were interfered with is not open to serious doubt. A number of witnesses testified that before plaintiffs put in their drainage system cattle were kept throughout the entire grazing season on pasturage owned by defendant, and that such cattle were not taken out for water, because there was always water in the pasture. Some of these witnesses had their own cattle in the pasture. Numerous other disinterested witnesses testified that they had frequently passed by defendant's land

and had observed that water was always running from plaintiffs' lands onto defendant's land. Some of plaintiffs' witnesses testified that they had traveled over the lane or road between plaintiffs' land and defendant's land and that no water was running onto defendant's land from the lands owned by plaintiffs. However, we are of the opinion that the clear preponderance of the evidence shows that the water flowed almost continuously from plaintiffs' lands onto defendant's land before the lands of the plaintiffs were drained. The learned trial judge appears to have held similar views. We quote the following from his written memorandum of decision which is made a part of the record on this appeal:

"While the court has no doubt that at various times during the year there may have been enough of this water to have reached the land of the defendant and it may have been that at most times there was sufficient water reaching the lower end of plaintiff's lands to provide ample water for the watering of stock grazing in defendant's pasture land, still we are of the opinion that the use of the defendant or his father was a secondary use to that of the plaintiffs or plaintiffs' predecessors."

During the course of the trial the defendant offered in evidence a water record book of Box Elder county, Utah. Defendant also offered in evidence a water certificate, the same being in words and figures as follows:

"Water Commissioner's Certificate
"No. 298, Box Elder County, U. T.

"This certifies to all whom it may concern:

"That William Wrighton was on the 10 day of July A. D. 1883, in pursuance of the provisions of Section 1 of an Act of the Legislative Assembly of the Territory of Utah, entitled, 'An Act providing for recording vested rights to the use of water, and regulating their exercise,' approved Feb. 20, 1880, by the undersigned Water Commissioners of Box Elder Co., U. T., adjudged to be entitled to his portion for 40 acres Primary Right of all surplus water shares, and 40/60 of a share allotted to class 1 of the natural supply known as M. D. Rosenbaum Springs for irrigation, annually from the date hereof,

under the supervision of the agent or agents duly appointed according to the provisions of said Act.

"[Signed] William Lowe,
"Carl Jensen,
"James Pett,
"Selectmen and ex Officio
Water Commissioners
"Box Elder Co., U. T.
"Brigham City, U. T., July 10, 1883."

Apparently the water record book of Box Elder county, Utah, which was offered in evidence, contained a record of the proceedings had by the selectmen and ex officio water commissoners of Box Elder county, Utah, as provided by Laws Utah 1880, c. 20, §§ 1, 3, and 4, pp. 36, 37, which read as follows:

"Sec. 1. Be it enacted by the Governor and Legislative Assembly of the Territory of Utah: That the Selectmen of the several counties of this Territory are hereby created ex officio Water Commissioners for their respective counties, whose powers and duties shall be to make, or cause to be made and recorded, such observations, from time to time, as they may deem necessary, of the quantity and flow of water in the natural sources of supply, and to determine, as near as may be, the average flow thereof at any season of the year, and receive, hear and determine all claims to the use of water, and on receipt of satisfactory proof of any right to the use of water having vested, to issue to the person owning such right a certificate therefor for recording, and to generally oversee, in person, or by agents appointed by them, the distribution of water within their respective counties, from natural sources of supply, to all the corporations, or persons, having joint rights in and to any natural source of supply, and to fairly distribute, according to the nature and extent of recorded rights, and according to law, to each of said corporations, or persons, their several portions of such water; and in case of dispute between any of such persons, or corporations, as to the nature, or extent, of their rights to the use of water, or right of way, or damages therefor, of any one or more of such persons, or corporations, to hear and decide upon all such disputed rights, and to file a copy of their findings and decisions as to such rights, with the County Recorder, and to distribute the water according to such findings or decision, unless otherwise ordered by a court of competent jurisdiction.
"2. * * *

"3. The certificates of the Water Commissioners shall state generally the nature and extent of the right to use water of the person, or corporation, to whom it is issued, and must be filed with the County Recorder for recording.

"4. It shall be the duty of the County Recorder of each county, upon any certificate of Water Commissioners being filed in his office, as prescribed by this Act, and upon any findings or decisions of any commissioners, or board of reference, as to the extent of any of such rights, and upon payment of the fees allowed by law for such service, to record, in a book, or books, to be kept by him for such purposes, all such certificates, findings and decisions, which said record shall be deemed to impart notice to all persons whomsoever of the contents thereof, and shall be prima facie evidence of the existence and verity of the facts therein recited."

Counsel for plaintiffs objected to the admission of the water certificate and also the water record book of Box Elder county, upon the grounds that the same were incompetent, irrelevant, and immaterial. The objections were sustained. These rulings are assigned as error. We are of the opinion that the water record book and certificate should have been received in evidence. The William Wrighton who is mentioned in the water certificate is defendant's predecessor in title. The M. D. Rosenbaum spring mentioned in the water certificate are the same springs as are involved in this proceeding. It is of course obvious that the issuance of the water certificate could not affect any vested right that M. D. Rosenbaum, predecessor of the plaintiffs, had to the springs in question, but the issuance of the certificate does tend to show that William Wrighton, the predecessor in title of the defendant, claimed some of the water of Rosenbaum springs as early as 1883, and that he was attempting to protect his title thereto. It thus appears that the predecessors in title of defendant claimed an interest in the springs located on plaintiffs' lands at least as early as 1883, and that sufficient water flowed from those springs before they were interfered with to provide water for the cattle which were kept in the pasture on the

defendant's land. So far as appears no water from the springs involved in this proceeding was claimed or used by any of plaintiffs' predecessors in title until a number of years after 1883.

There is a sharp conflict in the evidence as to whether or not any of the water from the spring located on plaintiffs' lands flowed down onto defendant's land ■ after the drains were put in. A number of defendant's witnesses testified the water continued at all times to flow from plaintiffs' lands onto defendant's land until two or three years before this suit was begun. The plaintiffs and some of their witnesses testified that after the plaintiffs constructed their drains all the water collected in the drains was used to irrigate plaintiffs' lands. There is, however, no allegation in plaintiffs' complaint that they acquired title to the water in dispute by adverse use. By their pleadings plaintiffs base their claim to the right to the water in controversy upon appropriation and development. There is evidence that upon several occasions the defendant's predecessor in title entered upon plaintiffs' lands and turned the water down onto the lands now owned by the defendant after the drains were put in. We are of the opinion that plaintiffs have not established title to the water in controversy by adverse use. We are also clearly of the opinion that the defendant has established title to some of the water which arises in the Rosenbaum springs located upon plaintiffs' lands. The trial court evidently found the defendant had some right or title in and to the water which arises on plaintiffs' lands, because, while the title was quieted in the plaintiffs, their right to the use of such water was confined to use upon the tract of land where the springs are located.

The determination of the extent of defendant's right to the use of the water in controversy presents a question not free from difficulty. That the defendant has a right to sufficient water for any live stock that may be pastured

upon his land is reasonably clear. The defendant contends that he is also entitled to water with which to irrigate his land. The evidence in support of defendant's claim that he and his predecessors in title have used the water flowing from the springs for irrigation, is somewhat meager. It does appear that in about 1880 defendant's predecessor in title plowed ditches and furrows so that the water flowing onto his land would spread out over his pasture. The amount of land that was thus irrigated, and the time of the year that the same was irrigated, is by no means certain. One witness testified that he had seen water on nearly all of defendant's land. Another witness testified that he had seen water spread out over about 15 acres of defendant's land, and still another witness testified that he had seen about 5 acres of defendant's land irrigated. The time of the year that the land was so irrigated does not appear. The amount of water that flowed from the Rosenbaum springs is likewise somewhat a matter of speculation. So far as appears, no measurement was ever made of the water flowing from the springs before they were interfered with by plaintiffs' drains. One of the witnesses estimated that the amount of water flowing from one of the springs was about half as big as a stream that flows from an ordinary tap. Another witness described the water coming from the springs as "quite a nice little stream," and yet another witness for defendant thought there was ample water flowing from the springs for live stock but probably not enough to use for irrigation. There was approximately one-third of a second foot of water flowing from plaintiffs' drain pipes in October, 1926. The evidence fairly supports the trial court's finding that one-half of this one-third of a second foot was developed by plaintiffs in the process of putting in their drains. There is no finding as to the amount of water that flowed from the springs or the amount of water that came from percolation or seepage. Such a finding would indeed be difficult to make from the evidence.

It appearing that the water in controversy arises on plaintiffs' lands, and that plaintiffs have for some years been in control of such water, the burden was cast upon defendant to show the nature and extent of his right. The defendant has failed to establish with any degree of certainty any title to any water claimed by him other than or in addition to sufficient water to provide for the needs of any live stock that may be kept on his land. Upon the record before us we are unable to determine the amount of water that will be necessary for such purpose. This cause is therefore remanded back to the trial court, with directions to that court to determine the amount of water that is reasonably necessary to supply any live stock that may be kept on defendant's land.

The parties should be permitted to offer such evidence as they may be advised as to the quantity of water that is necessary to supply such demand. In no event, however, is the defendant entitled to more than one-half of the water which flows from plaintiffs' drains. When the trial court shall have determined such fact, it is directed to recast its findings of fact, conclusions of law, and decree to the end that defendant's title to such water be quieted. In view of the fact that plaintiffs claimed all of the water here in dispute and brought this suit to quiet their title to such water, and in view of the further fact that they have failed to establish a right to all of such water, we are of the opinion, and so hold, that neither plaintiffs nor defendant should be allowed costs incurred in the trial of this case. It is therefore ordered that the judgment awarding plaintiffs their costs in the trial is reversed. Except as indicated in this opinion, the decree appealed from is affirmed. The total costs on this appeal shall be borne one-half by plaintiffs and one-half by defendant.

THURMAN, C. J., and CHERRY, STRAUP, and GIDEON, JJ. concur.