## SILVER KING CONSOL. MINING CO. v. SUTTON et al.

No. 5001. Decided May 17, 1934. 39 P. [2d] 682.)

Rehearing Denied December 31, 1934.

298

*Irvine, Skeen & Thurman, Stewart, Alexander & Budge,* and *H. L. Mulliner,* all of Salt Lake City, for appellants.

*R. J. Hogan, Dickson, Ellis, Parsons & McCrea,* and *Vernon Snyder,* all of Salt Lake City, and *J. E. Johnson,* of Park City, for respondent.

FOLLAND, Justice.

Plaintiff brought this suit to quiet title in and to certain underground waters assembled and collected in and flowing from its mine tunnel, sometimes called the Spiro Tunnel, located near Park City, Utah. Twenty-two persons and corporations were named as defendants of which only eleven answered.

In its complaint plaintiff alleged it was the owner of certain described lands and mining claims; that in the conduct of its business as a mining corporation it engaged in the driving of tunnels and drifts on and in its property, and that its underground workings connected with the surface through the Spiro Tunnel, then 15,545 feet in length; that by reason of such mining operations it developed a flow of water in the underground workings of its mine which water accumulates and flows out of the mouth of Spiro Tunnel; that the water so developed and flowing from the tunnel is the property of plaintiff; that defendants claim some interest in the waters of the tunnel. Plaintiff prayed that defendants be required to set forth their claims, and that they be adjudged to be without right or interest and be forever barred from asserting any claims or interest in such waters adverse to plaintiff and that plaintiff be decreed the owner thereof.

The appearing defendants by several answers denied that the tunnel waters were developed waters and denied such waters were the property of plaintiff; alleged that the waters were such as would, but for their interception by

the tunnel, have flowed to the surface through springs and over the creek bed of Thaynes Canyon and thence to East Canyon creek; that long prior to the construction of the tunnel they and their predecessors in interest had appropriated, diverted, and used, on lands owned by them, certain portions of the waters of Thaynes Canyon creek, of certain springs, and of the waters of East Canyon creek; that by the construction of the tunnel plaintiff had diverted waters which otherwise and prior thereto had found their way out of the springs and into East Canyon creek and Silver creek; and asserted ownership in and to the waters flowing from the tunnel by reason of such prior appropriation and use. The defendant Sutton, in addition, pleaded a counterclaim for damages on account of loss of profits in the operation of an ice pond by reason of alleged diminution of the water supply to such pond.

In its reply the plaintiff denied the waters of the tunnel have or ever had any relation whatever to the waters of Thaynes Canyon creek or the springs supplying the headwaters of East Canyon or Silver creeks and denied that any of defendant's waters had been diverted.

After an extended trial the district court of Summit county made findings favorable to plaintiff on all issues and made and entered a decree and judgment quieting title in plaintiff to all the waters seeping, percolating, or flowing into and intercepted, assembled, and collected in and flowing and to flow from the first 15,544 feet of the tunnel, with the exception of the seasonal flow on the upper contact of the Woodside shale at station 2765, and as to such waters granted to plaintiff the right to the first and prior use thereof in the operation of its mining property and, after such use is satisfied, decreed that such waters be allowed to flow from the tunnel into Spring creek (which feeds East Canyon creek) for the use of those who may be entitled as part of the public waters of the State.

Numerous errors are assigned by defendants on which

they rely for a reversal of the judgment. Most of the assigned errors go to the point that the findings of fact, and particular findings therein indicated, are not supported by, but are contrary to, the evidence, and that the conclusions reached by the trial court in the findings and decree are erroneous and have no foundation in law or fact.

The record is voluminous. The evidence is contained in approximately 4,500 typewritten pages of transcript, numerous maps, graphs, records of water measurements, and other documents.

This being a suit in equity, it is our duty to examine the evidence, determine its weight, and reach our own conclusions with respect thereto, bearing in mind, however, the rule so often announced by this court that the findings of a trial court will not be disturbed unless we are of the opinion they are against the clear preponderance of the evidence. *Holman* v. *Christensen*, 73 Utah 389, 274 P. 457. We have in mind also the other rule applicable to this kind of case which casts the burden on one who has discovered subterranean waters and claims such as his own to prove by a preponderance of the evidence that he is not intercepting the tributaries of appropriated streams or the sources of supply of prior appropriators. *Mountain Lake Mining Co.* v. *Midway Irrigation Co.*, 47 Utah 346, 149 P. 929, 934; *Midway Irr. Co.* v. *Snake Creek M. & T. Co.* (C. C. A.) 271 F. 157, affirmed by the Supreme Court of the United States in 260 U. S. 596, 43 S. Ct. 215, 67 L. Ed. 423. We have given special attention to the evidence on account of the circumstances attending the signing of the findings of fact, conclusions of law, and decree. These were signed by stamp signature of the judge who tried the cause when he was by serious and fatal illness confined to his bed in a hospital. We are not unmindful of the fact, however, that Judge M. L. Ritchie, before he was stricken, had given the case full and thorough consideration, as indicated by his written memorandum opinion in which he discussed the law and the evidence and directed

the drawing of findings, conclusions, and decree, in accordance with his announced decision in favor of the plaintiff.

It was made to appear that an action was pending in the district court of Weber county involving all the water rights of the Weber river system, which includes the waters flowing in East Canyon and Silver creeks, and from the springs claimed by defendants, and that since in that case the district court of Weber county had jurisdiction to adjudicate the respective rights of the defendants, the court in this action, even if it should find the waters, or any of them, issuing from the tunnel to be not "developed water," would not undertake to apportion such waters between the several defendants, but that the court in this case was limited to the single question of whether the waters of the tunnel, or part thereof, were in fact developed.

The single ultimate question, therefore, is whether the tunnel water or any part thereof is developed water. The waters of the tunnel are what are known as subterranean, diffused, or percolating waters, intercepted and collected within plaintiff's ground in the prosecution of its mining operations. There were encountered no subterranean streams with known or defined channels which directly connected with or fed any surface streams or springs. In July, 1916, plaintiff began the construction of its tunnel in the spur of a mountain on the east exposure of the Wasatch Range between Thaynes Canyon on the north and Nigger Hollow on the south. The first 15,544 feet of the tunnel was in ground owned by plaintiff and at that distance the tunnel entered, and had progressed at time of trial to a point 16,286 feet from the portal, in ground of the Silver King Coalition Mining Company. The latter corporation is not a party to the suit, and no questions arise with respect to any conflict of interest between it and plaintiff. The first water intercepted was encountered April 13, 1917, at a point 2,765 feet from the portal, and which on May 27, 1917, measured .88 of a second foot. The highest flow from the tunnel was in February, 1921, when

the total flow reached 12.9 second feet, at which time the face of the tunnel was approximately 14,000 feet from the portal. This flow gradually diminished in volume until at time of trial the flow was 5.26 second feet, having flowed between 5 and 6 second feet for a period of about two years.

Defendants are farmers and stock raisers who own and irrigate approximately 1,000 acres of hay lands in the mouth of Thaynes Canyon and to the east and north thereof. Numerous springs arise in this locality, and much of the land is swampy from either natural causes or from the irrigation of adjoining higher lands or both. Defendants take their water directly from Thaynes Canyon creek and from the springs or the streams fed by them. This spring area is the head of East Canyon creek which is a tributary of the Weber river and a part of the Weber river system. Some of the defendant's lands are in the Silver creek watershed. One of the springs referred to in the evidence, the Dorrity or Paulson, is on the Silver creek side of the divide and naturally flows, when not diverted, to Silver creek. Some of the lands on the Silver creek side of the divide are supplied from spring waters which, but for the diversion, would flow into East Canyon creek. Silver creek is also a tributary of the Weber river and is part of the Weber river system. Defendants contend that the percolating waters encountered in the tunnel are such as naturally seeped through the ground and, before the tunnel, ultimately flowed to the surface through the springs and seeps at the mouth of Thaynes Canyon and vicinity, that the drawing of water into the tunnel from the over-lying rock formations lowered to the level of the tunnel the supply of water above this level, which, if it had not been intercepted and afforded free drainage, would have been sustained at an elevation so as to feed such springs, and that by such interception and collection of the waters in the tunnel such waters were diverted away from and diminished the flow of the springs and the Thaynes Canyon

creek, all of which had been by defendants and their predecessors in interest appropriated, diverted, and used for more than forty years, for culinary, domestic, irrigation, and stock-watering purposes on their lands.

The principles of law which control the case are not in serious dispute, except as to the decree of the court granting plaintiff a qualified right to the use of the water flowing into the tunnel at station 2765, after finding in effect, that such waters were part of the source of supply of the springs and streams in which defendants are interested.

In the absence of a valid claim by either a prior appropriator under federal or state law or the owner of adjacent land claiming a right by virtue of any common or correlative interest, the percolating waters intercepted and brought to the surface by the owner of the freehold are the property of such landowner, who may use such waters as he sees fit even to the taking of them away for use elsewhere. *Crescent Mining Co.* v. *Silver King Mining Co.*, 17 Utah 444, 54 P. 244, 245, 70 Am. St. Rep. 810. This decision was based on the theory that percolating water is a part of the freehold and is not to be distinguished from the soil. The court said:

"The owner of the soil is entitled to the waters percolating through it, and such water is not subject to appropriation. The ordinary rules of law applying to the appropriation of surface streams do not apply to percolating water and subterranean streams, with undefined and unknown courses and banks. When water percolates through and under the surface of the earth upon land belonging to one person, and comes to the surface just before it empties itself upon the land of another, the owner of such land has no right to demand that such percolation shall continue."

To similar effect is the case of *Willow Creek Irr. Co.* v. *Michaelson*, 21 Utah 248, 60 P. 943, 944, 51 L. R. A. 280, 81 Am. St. Rep. 687, wherein the court announced the rule as follows:

"Water, intermingling with the ground or flowing through it by filtration or percolation or by chemical attraction, is but a component part of the earth, and has no characteristic of ownership distinct from

the land itself. In the eye of the law, water so commingled and flowing, or motionless, underneath the surface, is not the subject of ownership apart and distinct from the soil."

Appropriators of the waters of natural springs and streams, by virtue of their appropriations, acquire an interest or right in and to the waters which feed or supply such springs or streams, even though percolating in privately owned ground, where the lands supplying such waters were part of the public domain at the time of appropriation by such prior users. *Cole* and *Cole* v. *Richards Irr. Co.,* 27 Utah 205, 75 P. 376, 101 Am. St. Rep. 962; *Midway Irr. Co.* v. *Snake Creek M. & T. Co.* (C. C. A.) 271 F. 157, 162, as affirmed in *Snake Creek M. & T. Co.* v. *Midway Irr. Co.,* 260 U. S. 596, 43 S. Ct. 215, 67 L. Ed. 423; *Peterson* v. *Wood,* 71 Utah 77, 262 P. 828; *Rasmussen* v. *Moroni Irr. Co.,* 56 Utah 140, 189 P. 572; *Peterson* v. *Lund,* 57 Utah 162, 193 P. 1087; *Sullivan* v. *Northern Spy Min. Co.,* 11 Utah 438, 40 P. 709, 30 L. R. A. 186. It would seem to be settled law in this jurisdiction that, even though the right of a landowner to the waters percolating in and through his land is recognized, yet, where such percolating waters are intercepted and collected by the landowner, they may not be diverted away from the land where found to be used elsewhere if by so doing the sources of supply of natural springs and streams, the waters of which have been appropriated by prior appropriators when the lands in or through which they percolate were public lands at the time of appropriation, are diminished or depleted or otherwise adversely affected by such diversion.

It is also well settled that, where one claims he has developed water by means of tunnels or other underground works in close proximity to the source of a stream or spring, the waters of which have been previously appropriated by others, he is charged with the burden of proving that his claimed development of water does not interfer with the waters therefore appropriated; that the burden is on such person to show by satis-

factory proof that the water so intercepted and to be diverted is in fact "developed water" which would not, but for such interception, have supplied the sources of such prior appropriators. *Mountain Lake Min. Co.* v. *Midway Irr. Co.*, supra; *Bastian* v. *Nebeker*, 49 Utah 390, 163 P. 1092; *Midway Irr. Co.* v. *Snake Creek M. & T. Co.*, supra, and *Peterson* v. *Wood*, supra. The rule is stated in *Mountain Lake M. Co.* v. *Midway Irr. Co.*, supra, as follows:

"It is a well-recognized rule of law in this arid region that where, as in the case at bar, a party goes upon a stream, the waters of which have been appropriated and put to a beneficial use by others, and drives a tunnel into the mountain or watershed drained by the stream, and immediately under or in close proximity to the stream collects water which he claims to be developed water, he must make satisfactory proof that such water is in fact 'developed water.' In such case it is immaterial whether the water, when encountered, is flowing in well-defined subterranean channels or is percolating through the soil, gravel, and the fissures and crevices of the rock. In either event, the presumption is, until overcome by satisfactory proof, that the water is tributary to the main stream, and the right to its use is vested in the prior appropriators of the stream."

The rule arises from the presumption stated. The decision must rest on evidence, not the presumption. The office of the presumption is merely to give rise to the rule and cast the burden of proof, under such circumstances, on the one claiming to have developed water. In this case, therefore, the burden of proof is on plaintiff not only because of its status as plaintiff, and the allegations of its complaint, but also because of the rule which applies to all persons claiming developed water under the circumstances stated, whether they be parties plaintiff or defendant. Plaintiff does not deny, but concedes, that the burden of proof is on it to establish that its claimed developed waters are in fact developed waters, and that the interception and collection of such waters in its mining tunnel has not diminished or depleted the flow of the springs and sources from which defendants have taken their water by virtue of their prior appropriations. Plaintiff strongly contends

that it has discharged such duty and has by evidence clearly and convincingly shown that all the waters flowing from the Spiro Tunnel, with the exception of the flow encountered at station 2765, are in no way tributary to the springs or other sources in which defendants are interested. This also was the conclusion of the trial court, who found that the waters intercepted beyond station 2765 were newly developed and belonged to plaintiff. As to this the case turns on questions of fact, not of law, and we are required to look into the evidence to determine whether or not the findings are supported by a preponderance of the evidence.

With respect to the water flowing from 2765, another and different question of law is presented. The court, in effect, found these waters were part of the source of supply of the springs and streams arising in the vicinity, but decided that nevertheless such waters were subject to a prior right of use by plaintiff, as the landowner, for the operation of its mining property, and that such waters as were not consumed by such use must be turned into Spring creek for the use of those who shall by law be entitled thereto as part of the public waters of the state. This portion of the decree is assigned as erroneous as "without any right, jurisdiction, authority, findings or evidence to support it." In this jurisdiction the American or reasonable use rule, or, as otherwise expressed, the correlative right doctrine, has been adopted and applied to underground waters. *Horne* v. *Utah Oil Refining Co.*, 59 Utah 279, 202 P. 815, 31 A. L. R. 883; *Glover* v. *Utah Oil Refining Co.*, 62 Utah 174, 218 P. 955, 31 A. L. R. 900. This doctrine as declared in the above cases recognizes the correlative rights of adjacent landowners to underground artesian waters percolating in and through their respective tracts of land, and each is entitled to put his correlative share of such waters intercepted on his own land to a reasonable use in connection with the enjoyment of the land itself and, under certain circumstances, each may transport his correlative share for use elsewhere. There is no decision by

this court wherein the rule of reasonable use has been definitely applied to a landowner intercepting on his own land percolating waters which afford a source of supply to a stream or spring previously appropriated by others. The decision which more nearly touches this question is *Rasmussen* v. *Moroni Irr. Co.,* 56 Utah 140, 189 P. 572, wherein the court, while expressly limiting the decision to the facts therein stated, and denominated a "River System Case," recognized the right of the landowner to use the percolating waters on the land where found. An application of such rule has been made by the federal courts in a case arising in this state on facts similar to those in this case. In *Midway Irr. Co.* v. *Snake Creek M. & T. Co.,* supra, the United States Circuit Court, in reversing a decision of the United States District Court, which quieted title in the mining company to waters collected by its tunnel, enjoined the mining company from asserting any claim to the surplus waters flowing from the portal of its tunnel "not wanted for operating its mines" and with that qualification quieted title in the prior appropriators. The court in announcing the rule said:

"The American, as distinguished from the English rule, is that, while the owner of the land is entitled to appropriate subterranean or other waters accumulating on his land, which thereby become a part of the realty, he cannot extract and appropriate them in excess of a reasonable and beneficial use upon the land he owns, unconnected with the beneficial use of the land, especially if the exercise of such use in excess of the reasonable and beneficial use is injurious to others, who have substantial rights to the water."

This decision was affirmed by the Supreme Court of the United States in *Snake Creek M. & T. Co.* v. *Midway Irr. Co.,* supra.

In thus applying the reasonable use rule, the court undoubtedly had in mind such use of the water by the tunnel company in connection with its mining operations as would not materially depreciate the quantity or deteriorate the quality of the water to which others had prior rights by appropriation.

No specific issue has been made in this case with respect to any particular use which plaintiff may make of such water. The plaintiff has not shown either by pleading or proof that it has used or intends to use this water in any particular manner in connection with its mining operations. It claimed all the water as its own with which it could do as it pleased. The controversy here is not between adjacent landowners each claiming a correlative right to the use of underground waters, but is between prior appropriators on the one hand and a mining company on the other which is claimed to have interfered, by the driving of its tunnel, with the source of supply of springs and streams long ago appropriated and put to a beneficial use. Under these circumstances the rule of law applicable is not that pertaining to correlative rights, but the law of approriation. Each of these rules occupies a different field, and, where one is applicable to a given set of facts, the other is excluded thereby. Under the doctrine of appropriation there is no allowance for a landowner by means of tunnels or other artificial works to intercept a source of supply to streams or springs used by prior appropriators and to make such use of the water intercepted on the land where found or otherwise so as to diminish the quantity or deteriorate the quality of the water to the detriment of such prior appropriator. *Peterson* v. *Wood*, 71 Utah 77, 262 P. 828.

There is here no definite finding that defendants and their predecessors in interest had made their appropriations at a time when plaintiff's lands were still public domain, but enough appears in the evidence and the findings as to when plaintiff obtained patents to its land and and the length of time defendants and their predecessors had used the water of the springs and streams, under their appropriations, to lead to the conclusion that defendants made their appropriations of the water before plaintiff's lands were segregated from the public domain. Under such facts plaintiff's use of the waters flowing from the

first 2,765 feet of its tunnel should be subordinate rather than superior to the use of the prior appropriators. The decree should be amended to conform to this view.

The case, so far as it concerns the large flow from beyond station 2765 in the tunnel, turns on questions of fact rather than of law. The trial court found this was all developed water belonging to plaintiff as owner of the soil. For convenience we may classify the evidence ■ under three heads: (1) Evidence with respect to the natural rock formations, their permeability to water, the dip of the formations, their outcroppings, whether in Thaynes Canyon or beyond, and the occurrence of water in the tunnel, all as bearing on the question of whether or not the water intercepted in the inner parts of the tunnel could have found its way to the surface through the springs in which defendants are interested; (2) measurements of the flow of the springs, streams, and other water sources and of the water flowing from the tunnel, and the opinions of nonexperts based on observations of the flow of the springs and streams; and (3) evidence respecting the use of water on the farm lands of defendants.

The court made rather elaborate findings of fact, many of which are objected to by appellants as not supported by the evidence. Twenty-four of the assignments of error are to that effect. The findings, so far as they touch matters relating to underground formations, and the occurrence of water therein, may be summarized as follows:

The tunnel was driven into the mountain along a course south 28 degrees 38 minutes west for 13,935 feet, and thence in a southerly direction by various courses a total distance, at time of trial, of 16,286 feet from the portal to its face. The first 15,544 feet is entirely in property of plaintiff. The first 20 or 30 feet of the tunnel was in loose dirt, beyond which point it is in the solid rock of the various sedimentary formations of the district. These formations follow each other in definite sequence. The first rock formation is the Thaynes, through which the tunnel extended

for 2,765 feet from the portal, where it encountered and entered the Woodside shale. At this point the vertical depth of the tunnel is 700 feet beneath the surface. It continued in Woodside shale for 5,135 feet, when it entered the Park City formation and continued in that formation for 4,800 feet to station 12,700, where it entered the Weber quartzite. At the face the tunnel attains a vertical depth of about 2,000 feet beneath the surface immediately above it. The Thaynes formation consists of calcareous sandstone and sandy lime, a relatively pervious formation. The Woodside shale is composed entirely of shale which is fine grained, thinly laminated, and impervious in character, and is essentially a mud rock. The Park City formation is composed of limestone, sandstone, quartzite, and beds of shale. Within the Park City formation and about 150 feet in thickness is a black carbonaceous shale which is exceedingly impervious. The Weber quartzite is relatively fine grained and consists of cemented quartz. It is a very brittle formation and comparatively easily fractured. The dip of the formations is to the west and northwest. The average dip of the Thaynes formation is 30 degrees and the average strike about north 45 degrees west. The first occurrence of water in the tunnel was at the contact of the Thaynes limestone and Woodside shale at station 2765. In April, 1917, this flow amounted to one-tenth of a second foot, and increased to .88 of a second foot on May 27, 1917. This water occurrence when first intercepted, and every year since, has shown the same relative rise from a low point in the early spring to a peak about the 1st of June, decreasing through the summer and drying up in winter. The first 1,629 feet in the Woodside shale was dry, then for a distance of 2,200 feet in the Woodside shale water was encountered in small quantities by seep and drip. The last 1,300 feet through the Woodside shale was dry. The first 1,100 feet through the Park City formation was dry. At various points under the black shale in the Park City formation and particularly in the Weber quartzite large

quantities of water were encountered. The flow from the tunnel attained its maximum of 12.9 second feet between February 1 and 4, 1921; most of the water coming from beneath and beyond the black shale in the Park City formation. This flow gradually diminished until at the time of trial there was flowing from the tunnel about 5½ second feet. None of the formations geologically below the Thaynes, and accordingly none of the impervious formations, outcrop within Thaynes Canyon or the Thaynes Canyon watershed or drainage area. On their dip these supply an effectual seal or roof over the tunnel, and afford an impenetrable barrier to descending waters from the surface of that drainage area. That there is no evidence of fissures, cracks, or openings that might reasonably be expected to extend from the surface to the tunnel and afford pathways for descending surface waters into the tunnel or into the formation from which the tunnel derives its waters, or prior to the tunnel, for ascending water from depth to the surface, and thereupon the court found there was none. That, while the Weber quartzite is faulted and broken, the shales did not fracture, and, being thinly laminated, the shale absorbed the movement, so that no interstices were formed which would permit the migration of water, and that there is no fracture through the Woodside or black shales that would permit the passage of water from the surface of the Thaynes Canyon drainage area or its vicinity downward into the tunnel or the formation from which it derives its waters, or from those formations to the surface springs or water courses.

The tunnel, in its course, extends beneath the Thaynes Canyon watershed or drainage area. For the first 10,500 feet in its course it approaches the creek bed and crosses its path at that point about 1,270 feet vertically beneath the creek bed, and thence proceeds away from it on the south side. Thaynes Canyon creek does not flow the entire year, but commences to flow in April or early in May at about the time the springs and the flow in the tunnel at

station 2765 begin to rise to their peak and usually stops some time in July. From that time on until the next April there is no water flowing in the creek bed. The springs from which defendants obtain their supply of water show similar seasonal variation, as well as an annual variation, in flow. From a small flow in April they increase until they reach a peak in June and maintain that peak for a short time and decline until October or November, when they attain the low level of April. The only waters of the tunnel which show seasonal variation are those encountered at station 2765, which waters have characteristics similar to those flowing from the springs and other sources in which defendants have an interest.

From these facts the trial court reached the conclusion that the springs were of the shallow surface gravity type largely with sources confined to a comparatively small area and near the surface, and that the waters flowing from station 2765 were of the same or similar sources and related thereto, but that the large flow from the Park City and Weber quartzite formations came from different and other sources, and that their interception and collection and discharge through the tunnel did not affect the springs and other surface flows; that the waters encountered, gathered, and discharged from the tunnel, except the flow of station 2765, are and were part of the free deep-seated ground waters of the mountain formation and do not bear any relation to and are not tributaries of the waters of Thayne Canyon or any of the springs or other sources in which defendants have an interest by reason of their prior appropriations.

Nearly all the determinative facts as found by the trial court are attacked by the assignments of error as not supported by the evidence. It would necessarily enlarge this opinion to recite, even in a general way, the testimony found in the record to support the findings. It is sufficient to say that we have carefully read the abstract of the testimony of the witnesses, and in many instances where

the conflict between witnesses is acute have had recourse to the transcript, and are fully satisfied that the findings as outlined by us find support not only by some of the evidence, but by a preponderance thereof. One significant bit of testimony is that in the underground workings of the Crescent Mine, which are almost directly over the tunnel, water remained standing in such workings, when not pumped, notwithstanding the driving of the tunnel at a lower elevation, indicating no flow through the intervening formations from the Crescent workings to the tunnel. Evidence of the underground formations and of the conditions found in the progress of the driving of the tunnel was supplied by men who were intimately familiar by reason of years of work in the Park City district, and in this mine in particular, with the geological formations and their characteristics; their memory being refreshed by the careful log of water occurrences made at the time the tunnel was being constructed.

The vital point in the case, however, is whether the flow of the springs has diminished since water commenced to flow from the tunnel. It is always difficult for even the most experienced of geologists to definitely determine the source, the course through the earth, or the destination of waters found in the deep formations of the mountains where there is no underground water course intercepted which shows an immediate or remote effect on some spring rising in the general neighborhood or in or close to the watershed area in which the tunnel is constructed.

With respect to the springs, the court made findings in effect as follows: That the Nelson Springs, Thaynes Canyon creek, Sullivan Springs, Craig or Martin Springs, Hidden Springs, Dorrity or Paulson Spring, Little Thiriot or Haueter Small Spring, Whistler stream, Glenwood Cemetery Spring, Thiriot or Haueter Spring, Snyder or Carey Spring, Tank Hollow Spring (most of which are the sources of supply claimed by defendatns or some of them), and the seasonal flow on the contact between the Woodside

shale and the Thaynes formation at station 2765 of the tunnel all have much the same characteristis of flow. That Thaynes Canyon creek commences to flow usually in April or early in May, at about the time the springs and the tunnel flow from station 2765 begin to rise to their peak and stops some time in July, which is about a month after the springs and the tunnel flow from station 2765 have reached their peak and started their decline. That all these springs and water sources have comparatively small flow in April and increase until about the 1st of June, maintain their peak, which is about ten or twelve times that of the April flow, for a short time, and then decline rapidly until October or November, when they attain the low level of April. That their water sources also show an annual variation, far less in proportion than the seasonal variation, and that the same irregularity in flow was apparent previous to the driving of plaintiff's tunnel as was apparent after its construction, and that the seasonal and annual variation in one spring appears in all of them. That notwithstanding the large flow of 12.9 second feet which commenced about February 1, 1921, and gradually subsided to a flow of 5.26 at the time of trial, during which time more than 15,300,000,000 gallons of water flowed from the tunnel, none of the springs dried up nor has their flow nor that from the tunnel at station 2765 been diminished, with the single exception of Fishpond Spring, which diminished one-half. That this diminution was caused by clogging of the spring and failure to keep it clean, and not to the driving of the tunnel. That the flow of the tunnel, with the exception of that from station 2765, has not shown either seasonal or annual fluctuations, but merely a steadily decreasing flow from its peak in 1921 to the time of the trial.

The court found, based on these and other facts, that the flow of water feeding the springs and the tunnel at station 2765 is perched or percolating water and has no connection with the water intercepted by the tunnel elsewhere than at station 2765, and that the tunnel water, with that excep-

tion, is part of the free deep-seated ground waters sealed in the bowels of the earth, and which would not have some to the surface but for the tunnel.

Plaintiff put in evidence hundreds of readings of stream and spring flow measurements. There is of course variation in the flow from year to year and from month to month in any one season. A few comparisons only are necessary. The largest springs were the Sullivan, Thiriot, or Haueter, and the Dorrity or Paulson. The Dorrity Spring is located about two miles distant from the point where any water was developed in the tunnel, and is about a mile and one-half in an easterly direction from the portal. It rises from the Midred shale in the Thaynes formation. The Midred shale has been entirely eroded away above the tunnel, so that all the waters of the tunnel come from a geological horizon below the Midred shale. This spring is on the Silver creek side of the divide, and if not diverted would flow to Silver creek and away from East Canyon creek. It is located on the property now owned by the State of Utah. There is testimony by nonexpert witnesses that it has diminished in flow since the driving of the tunnel, and by other witnesses that the flow now is as great as before. It is subject to seasonal influences, flowing more in the early summer and decreasing in the fall and winter, but flowing the year around. Only a few measurements were made of this spring. The earliest were by the state engineer, who on August 24, 1904, reported a flow of 1.29 second feet. It was measured by plaintiff's engineer in 1919, when on May 22d the flow was 1.9 second feet, June 4th, 2.65 second feet, and July 31st, 2.64 second feet. No other measurements were made until in 1927, when the following flows are reported by plaintiff's engineer: August 5th, 3.8; August 31st, 3.42; September 24th, 2.77; and October 12th, 2.48 second feet. These measurements satisfactorily show that the Dorrity Spring has not been adversely affected by the driving of the tunnel.

The largest of the springs is the Thiriot or Haueter,

located below the portal of the tunnel and at the easterly edge of the tunnel dump. It flows out on or near the top of the Woodside shale on its contact with the Thaynes formation, the same relative geological position as the flow in the tunnel at station 2765. Paintiff's engineer made numerous mesaurements of this spring, commencing in April of 1917 and concluding in October of 1927. During several years the readings were sufficiently complete to permit the computation of a mean flow for those years as follows: 1917, 5.55 second feet; 1919, 2.27 second feet; 1920, 5.61 second feet; 1921, 6.56 second feet; 1922, 6.46 second feet; 1923, 5.37 second feet. The readings taken early in August of certain years suggest the following comparison with readings made by the state engineer in 1904:

```
1904: August   3, 4.13 second feet
      August   8, 4.73 second feet
1917: August   3, 5.50 second feet
      August  17, 4.06 second feet
1919: August  16, 1.78 second feet
1920: August  10, 2.96 second feet
1921: August  10, 4.52 second feet
1922: August  10, 4.06 second feet
1923: August   4, 4.43 second feet
1925: July     8, 4.28 second feet
1927: August   4, 3.62 second feet
```

There were no readings made in 1924 or 1926 and only five readings made in 1927 commencing July 11th, when the flow was 5.89, and ending October 12th, when it was 1.82. It would be helpful if subsequent readings could be made to determine whether the flow held up in comparison with the years 1919 to 1923. Defendants are insistent that the flow measured in the years 1919 to 1923 must have included seepage into the spring from the tunnel, but we are satisfied from the record that the measurements were carefully made by plaintiff's engineer who excluded other waters flowing into the spring by making and deducting the measurements of such other water.

The Sullivan Spring is another large spring. It rises and

flows out of the mouth of Thaynes Canyon across the canyon to the west and north of the tunnel portal. The canyon floor is covered with glacial material consisting of boulders, gravel, and soil, and below the Sullivan Spring is the fine material forming an alluvial fan. The evidence tends to show that this spring derives its water from precipation above it in Thaynes Canyon which sinks into the porous glacial material and is brought to the surface upon reaching the more impervious layer of the alluvial fan. The Sullivans and others testified to a diminished flow from the Sullivan Spring since the driving of the tunnel, while other witnesses produced by plaintiff testified that there was no diminution in flow. The only measurements produced were obtained by plaintiff's engineer, and an early measurement made by the state engineer in 1904. The measurements are the least satisfactory of any of the springs because there are so few of them. This spring, probably more than the others, is directly affected by precipitation because it shows a greater spread between its minimum and maximum flow. The first measurements were by the state engineer in 1904. On August 8th of that year the flow was 4.4 second feet. Several measurements were taken in 1917 by plaintiff's engineer showing the flow on June 9th to be 24.30; July 8th, 7.87; August 3d, 3.58; August 17th, 2.94; August 31st, 2.52; October 17th, 1.88. Again in 1919 the flow was .94 on April 3, and .91 on April 15. Plaintiff's engineer testified the Sullivans refused to permit him access to the spring for the purpose of making measurements and consequently no readings were made by plaintiff until after suit was commenced when permission was obtained from the attorney for Mrs. Sullivan. The measurements taken in 1927 were as follows: August 31st, 2.39; September 24th, 3.04; October 12th, 1.75. Mr. Dan Sullivan, a son of defendant Mrs. Elizabeth Sullivan, testified that, when Mr. Blye made these measurements in 1927, he, upon seeing him go to the spring, opened the taps to the pipe system leading to the Sullivan home and barn, thereby

drawing water from the spring. The water thus drawn would not be included in the flow measured. The flow measured would therefore be less than the total flow of the springs. We cannot help believing that there have been no adequate measurements of this spring to justify the finding that its flow has not been diminished. The record, such as we have, shows it has not been depleted, but it may have sustained some loss. Members of the Sullivan family are in part responsible for the paucity of measurements and the inaccuracy in the 1927 measurements. They, however, are not the only persons affected by a diminution of the flow of these springs, if any, and their conduct should not be held to prejudice other water users who depend on the Sullivan Spring for water.

The springs already mentioned are the largest and furnish most of the water claimed by defendants. A number of small springs are referred to in the evidence and measurements and comparisons of their flow before and after the tunnel was driven were introduced largely for the purpose of indicating the effect, or lack of effect, of the tunnel on the water-bearing area in and near the mouth of Thaynes Canyon. The Carey or Snyder, Craig, Fishpond or Ferry No. 1, Whistler Stream or Ferry No. 2 and 3 Spring, supplied water used by the defendants or some of them. Numerous measurements were made and introduced of the flow from these springs. We shall refer to only a few of such made on comparable dates of different years, as follows:

The Craig Spring:

| 1917 | | | 1927 | | |
|------|-----|-----------------|------|-----|-----------------|
| May | 16, | .35 second feet | July | 11, | .13 second feet |
| Aug. | 4, | .12 second feet | Aug. | 31, | .15 second feet |
| Sept. | 24, | .17 second feet | Oct. | 12, | .14 second feet |

The reading of May 16th was undoubtedly a high water reading, while the other readings are fairly comparable and would indicate no diminution in the flow.

The Hidden Spring:

| | | |
|---|---|---|
| 1904: Aug. 1, .01 | 1927: July 11, .025 |
| 1916: June 25, .3 | Aug. 4, .011 |
| 1917: May 16, .28 | |

Haueter Small Spring: A mean flow as follows:

1917, .26;  1919, .14;  1920, .20;  1921, .17;  1922, .24.

Whistler Stream:

| | |
|---|---|
| 1917: July 8, .18; | 1923: July 3, .56; |
| 1919: July 11, .10; | July 21, .33; |
| 1920: July 10, .18; | 1925: July 8, .10; |
| 1921: July 10, .47; | 1927: July 11, .18; |
| 1922: July 10, .44; | |

Fishpond Spring:

1904: Aug. 1, .17;  1920: Aug. 10, .05;  1921: Aug. 10, .05.

The court found this spring had diminished in flow, but that the cause thereof was not the driving of the tunnel but because the spring became clogged and had not been cleaned. No error was assigned to this finding.

Carey or Snyder Spring:

1916: June 25, .55;  1928: July 3, .50.

It is hardly conceivable that, if the tunnel large flow originating beyond the Woodside shale had tapped the sources of these springs, the flow of the springs would have held up as indicated by later measurements. It was testified, and the court found, that more than 15,000,-000,000 gallons of water had flowed from the tunnel since 1921, yet none of these springs ceased to flow. The conclusion is irresistible that the tunnel had not, except as already indicated, tapped or interfered with any of the sources of these springs.

Mr. W. H. Nelson testified that the upper Nelson Spring had ceased to flow. None of the defendants used water from the Nelson Springs, of which there were three. Nelson, in anitcipation of the tunnel affecting the Nelson

Springs, procured an engineer to measure the water from the springs, and afterwards suit was brought against the mining company for the depletion of the flow. The amount of water claimed by him, as shown by the engineer's measurement made September 6, 1916, was .25 of a second foot. The state engineer had measured the springs on August 8 and 12, 1904, at which time there was a flow of .12 of a second foot. Measurements made by plaintiff's engineer in September of the following years indicated a flow as follows: 1919, .07; 1920, .18; 1921, .24; 1922, .3; 1923, .31; 1927, .15. These readings indicate the total flow from these springs was not depleted although the higher spring ceased its flow after the tunnel was driven. Neither Nelson nor his mother, who owns the lands on which the water is used, is a party to this suit.

It will be remembered that the water occurrence in the tunnel at station 2765 was encountered in April of 1917, the water in the Woodside shale at 4394 to 6600 between October, 1917, and May, 1918, and that the large flow beyond the black shale of the Park City formation not until April and May of 1920 with the peak flow in February of 1921. Another comparison of spring measurements well illustrates that there was little, if any, effect on the springs by the tunnel flow from beneath the black shale:

| 1904 | | | 1927 | |
|------|------|-------|------|------|
| Aug. 4: Thiriot, | 4.13; | | Aug. 31:.... | 3.45 |
| Aug. 1 Whistler, | 0.23; | | Aug. 31:.... | .09 |
| Aug. 8: Nelson, | 0.12; | | Aug. 31:.... | .18 |
| Aug. 8: Sullivan, | 4.40; | | Aug. 31:.... | 2.39 |
| Aug. 1: Craig, | 0.19; | | Aug. 31:.... | .15 |
| Aug. 1: Hidden, | 0.009; | | Aug. 31:.... | .011 |
| Aug. 24: Dorrity, | 1.29: | | Aug. 31:.... | 3.42 |
| | 10.369 | | | 9.691 |

The readings for 1927 were all later in the season than those of 1904, so we would naturally expect the flow to be less. It must be remembered too that the reading of the

Sullivan Spring on August 31st was at the time when Dan Sullivan secretly opened the taps to the pipesystem leading to the Sullivan home and barn, thereby diminishing the amount of water measured to the extent of the maximum amount that would flow through the pipe. A reading taken later in the same year of the Sullivan Springs indicated a flow of 3.04 second feet on September 24th, or .65 of a second foot higher nearly a month later. While the above comparison shows some springs flowing less August 31, 1927, and some more than at the early August dates of 1904, the total is fairly comparable and tends to indicate that the water supply was not substantially affected by the tunnel.

It will be noted that no measurements were furnished by the defendants; all were supplied by the plaintiff. The defendants contented themselves with merely making visual observations and then testifying that the flow was less after the interception of water in the tunnel. Dan Sullivan testified he placed a weir in the stream running from the Sullivan Spring and had measured the flow but had forgotten the reading.

Where there is a claimed diminution in the supply of water appropriated by prior users on account of interception of percolating waters claimed to feed the sources of supply, the court should, if possible, determine the quantity of water that the prior appropriator is entitled to, and, if the quantity varies in different seasons of the year, determine it for each season and award such prior appropriators the quantity so determined. See *Bastian* v. *Nebeker*, 49 Utah 390, 163 P. 1092. From the record before us it is not possible to make any findings respecting the quantity of water the defendants or any of them are entitled to by reason of prior appropriations. This factor of the situation was not stressed for the reason that an action was pending in another court of the state involving the water rights of all users from the Weber river system. The case was tried, as already indicated, on

the single issue of whether or not the tunnel water, or any of it, was developed water.

From the testimony of defendants it is impossible to compute the exact or even the approximate acreage irrigated by them before the tunnel was driven or the amount of water used. They used all that was available. Because of the annual and seasonal variation in flow of the springs, it is impossible to fix any exact quantity of water that defendants are entitled to by reason of their appropriations. No effort was made at the trial to determine the amount of water needed for irrigation or the duty of water as applied to the lands of defendants except such as is found in the report of the state engineer to the district court of the second judicial district in the case pending invloving the waters of the Weber river system, which indicates the duty of from 60 to 80 acres per second foot of water. The case was tried by both sides on the issue of whether or not the tunnel water was developed water. We cannot then from the evidence well determine defendants' needs or the amount of water actually used, except by reference to the flow of the springs, all of which they claimed to have used under their appropriations. Some of the defendants who testified had no knowledge of the water flow or amount of water used in the irrigation of their lands prior to the tunnel, they having acquired their holdings at about the time of driving the tunnel or later.

From the whole record we conclude that the findings and decree rightly award the water intercepted by the tunnel at station 2765 to the water users as their interest may appear, subject only to reasonable use by the plaintiff in its mining operations, and that the water intercepted beyond and beneath the black shale in the Park City formation is rightly awarded to paintiff as developed water.

Some water was intercepted in the middle third of the Woodside shale, between stations 4394 and 6600. This came into the tunnel over an area of 2,200 feet in small

seeps and drips. We do not have any actual measurement of this quantity, except as measured with that ■ flowing into the tunnel in 1918 at 2765, at the time the tunnel was progressing through the wet area, and until water was intercepted beneath the black shale in the spring of 1919. This water was by the court awarded to plaintiff. We cannot say that the preponderance of the evidence supports the finding that this water was deep-seated water which did not come from the same or similar sources as the water of the springs. There are facts in evidence which lead us to believe that this water should be classed with that flowing from station 2765, and hence should be discharged into Spring creek with it, subject to the same conditions of use by plaintiff on the premises in its mining operations. The water seeped down along the bedding planes of the Woodside shale, and, while not possessing the same characteristics as that at 2765 with respect to seasonal fluctuation, yet probably came from the surface in or near Thaynes Canyon, and, but for the tunnel, may have found its way to some of the springs or streams at the mouth of Thaynes Canyon. Mr. Blye, plaintiff's engineer and superintendent, while testifying that in his opinion the interception of this water did not affect the flow of the springs or cut off their supply, on cross-examination said:

"I believe it very probable that the water which we encountered at 4394 had the same source as the water at 2765. I don't think it had the same fluctuation as the water at 2765, because in one case the water was coming down in a definite channel, the water encountered at 2765, in the other case it was slowly seeping through a close textured formation. The conditions are quite different. The water we encountered at 4394 apparently migrated rather slowly. I would think it very possible that the source of this water was the same that supplied the springs. When we drained off the water at point 4394 by means of a tunnel, we didn't necessarily take water from the source that fed the springs; from a similar source."

The same witness testified further with respect to the commencement of the impervious capping over the tunnel, as follows:

"This impervious cap commenced as we approached the bottom of the Woodside formation; those bottom layers constituted a part of this impervious cap as the tunnel was driven in further into the Park City formation, so into the remaining portion of this impervious capping. I consider that this impervious capping undoubtedly commenced about 6,500 feet from the portal; at that some of the layers above that point might also be considered impermeable. I considered it was undoubtedly impervious beyond 6500 feet at this point; between 6500 and 6600 feet, I believe the point C was put on there to indicate that point. At or about the point C we got into the territory which constituted this impervious capping. I said that I considered some of these prior layers of shale to be more or less impervious."

We are unable to say that plaintiff has shown by a preponderance of the evidence that these waters are newly developed. No water was encountered between the point 6,600 feet from the portal and the lower contact of the black shale at point 12,200. Beyond the lower contact of the black shale in the Park City formation and in the Weber quartzite the large flow was intercepted. Measuring devices should be erected and maintained in such locations as to accurately measure the water flowing from beneath the black shale to the end that the water making in the tunnel in the first 6,600 feet thereof be delivered into Spring creek for use of appropriators as their interest may appear, subject to plaintiff's use as provided in the decree.

There is always a substantial lag in the movement of waters through close rock formations underground. The lowering of the ground water level by the creation of a relatively free deep drainage through the tunnel might well affect water which formerly reached the surface at higher elevations and percolated through the loose detrital material in Thaynes Canyon to feed springs lower down. If these deep-seated waters, tapped by the tunnel, did actually support waters which in that way fed the lower springs, because of the lag in migrating through the close formations, the full effect thereof might not be noticeable for several years or the effect be so gradual as not to be indicated by the spring flow measurements within the first

year or two after the interception of such underground waters. The spring flow measurements made and supplied by plaintiff with the exception of those of the Sullivan Spring are reasonably full and satisfactory for the years 1917, 1919, 1920, 1921, 1922, and 1923. There were no measurements made in 1924 or 1926 and but few in 1925 and 1927. There were no measurements of the Dorrity and Sullivan Springs, two of the largest, between 1919 and 1927. While such flow readings as were submitted quite conclusively show that the flow of the Dorrity Spring was neither depleted nor diminished, the measurements made of the Sullivan Spring are far from satisfactory or conclusive for reasons already stated.

The court made findings in favor of the plaintiff and against the defendant on the issues raised by the counter-claim of W. D. Sutton. Without elaborating on the evidence we find it sharply divided with respect to these issues, but there is ample evidence in the record to support the findings of the trial court, and we are unable to say that the evidence preponderates against such findings and therefore decline to interfere with them.

The judgment of the trial court should be modified as indicated, and affirmed as modified, conditionally, however, in this respect: The district court of Summit county is required to retain jurisdiction of the case for the purposes herein stated. The court should appoint a competent water engineer as court commissioner, whose duty it shall be to install measuring devices in plaintiff's tunnel to measure the flow from the first 6,600 feet and that which flows into the tunnel beyond that point, to install measuring devices in the streams flowing from the Thiriot, Sullivan, and Dorrity Springs, and such others of the smaller springs as the parties may suggest to the court as necessary, and make measurements of such flows at least twice a month in the months of April, May, June, July, August, and September of the years 1935 and 1936, and make his report to the court of such measurements.

Thereupon, either party may move the court for a modification of the decree. If such motion be made by either party, then such additional evidence may be adduced, in addition to the report of the commissioner, as the parties may desire to submit bearing on the question of whether the decree be modified or not. The expenses of the commissioner should be paid by plaintiff because the burden is on it to show by clear and convincing evidence that the water claimed by it is developed water. *Bastian* v. *Nebeker,* supra. If it should then appear after the lapse of time indicated, that the sources in which defendants are interested have not been depleted or diminished, the judgment should not be disturbed, but, if the additional evidence indicates the drawing of the waters by the tunnel has depleted or diminished the springs and other sources of defendants, then such modification as the evidence demands should be made by the trial court in the findings of fact, conclusions of law and decree. Costs of this appeal should be divided; each side to bear their own costs for abstract and briefs, and plaintiff to pay half of the cost of the transcript of the evidence.

STRAUP, C. J., and ELIAS HANSEN and EPHRAIM HANSON, JJ., concur.

MOFFAT, Justice (concurring in the result, dissenting in part).

Had the following been omitted from the prevailing opinion it is possible I could have fully concurred:

"In this jurisdiction the American or reasonable use rule, or as otherwise expressed, the correlative right doctrine, has been adopted and applied to underground waters. *Horne* v. *Utah Oil Refining Co.,* 59 Utah 279, 202 P. 815, 31 A. L. R. 883; *Glover* v. *Utah Oil Refining Co.,* 62 Utah 174, 218 P. 955, 31 A. L. R. 900. This doctrine as declared in the above cases recognizes the correlative rights of adjacent landowners to underground artesian waters percolating in and through their respective tracts of land, and each is entitled to put his correlative share of such waters intercepted on his own land to a reasonable use in connection with the enjoyment of the land itself and, under

certain circumstances, each may transport his correlative share for use elsewhere. There is no decision by this court wherein the rule of reasonable use has been definitely applied to a landowner intercepting on his own land percolating waters which afford a source of supply to a stream or spring previously appropriated by others. The decision which more nearly touches this question is *Rasmussen* v. *Moroni Irr. Co.*, 56 Utah 140, 189 P. 572, wherein the court, while expressly limiting the decision to the facts therein stated, and denominated a 'River System Case,' recognized the right of the landowner to use the percolating waters on the land where found. An application of such rule has been made by the federal courts in a case arising in this state on facts similar to those in this case. In *Midway Irr. Co.* v. *Snake Creek M. & T. Co.*, supra, the United States Circuit Court, in reversing a decision of the United States District Court, which quieted title in the mining company to waters collected by its tunnel, enjoined the mining company from asserting any claim to the surplus waters flowing from the portal of its tunnel 'not wanted for operating its nimes' and with that qualification quieted title in the prior appropriators. The court in announcing the rule said: 'The American, as distinguished from the English rule, is that, while the owner of the land is entitled to appropriate subterranean or other waters accumulating on his land, which thereby become a part of the realty, he cannot extract and appropriate them in excess of a reasonable and beneficial use upon the land he owns, unconnected with the beneficial use of the land, especially if the exercise of such use in excess of the reasonable and beneficial use is injurious to others, who have substantial rights to the water.'

"This decision was affirmed by the Supreme Court of the United States in *Snake Creek M. & T. Co.* v. *Midway Irr. Co.*, supra.

"In thus applying the reasonable use rule the court undoubtedly had in mind such use of the water by the tunnel company in connection with its mining operations as would not materially depreciate the quantity or deteriorate the quality of the water to which others had prior rights by appropriation.

"No specific issue has been made in this case with respect to any particular use which plaintiff may make of such water. The plaintiff has not shown either by pleading or proof that it has used or intends to use this water in any particular manner in connection with its mining operations. It claimed all the water as its own with which it could do as it pleased. The controversy here is not between adjacent landowners each claiming a correlative right to the use of underground waters, but is between prior appropriators on the one hand and a mining company on the other which is claimed to have interfered, by the driving of its tunnel, with the source of supply of springs

and streams long ago appropriated and put to a beneficial use. Under these circumstances the rule of law applicable is not that pertaining to correlative rights, but the law of appropriation. Each of these rules occupies a different field, and, where one is applicable to a given set of facts, the other is excluded thereby. Under the doctrine of appropriation there is no allowance for a landowner by means of tunnels or other artificial works to intercept a source of supply to streams or springs used by prior appropriators and to make such use of the water intercepted on the land where found or otherwise so as to diminish the quantity or deteriorate the quality of the water to the detriment of such prior appropriator. *Peterson* v. *Wood,* 71 Utah 77, 262 P. 828.

"There is here no definite finding that defendants and their predecessors in interest had made their appropriations at a time when plaintiff's lands were still public domain, but enough appears in the evidence and the findings as to when plaintiff obtained patents to its land and the length of time defendants and their predecessors had used the water of the springs and streams, under their appropriations, to lead to the conclusion that defendants made their appropriations of the water before plaintiff's lands were segregated from the public domain."

Part of the above quotation, in so far as its being a correct statement of the law in this jurisdiction is concerned, I readily concede; but its applicability to the instant case does not appear.

It is said:

"In this jurisdiction the American or reasonable use rule, or as otherwise expressed, the correlative right doctrine, has been adopted and applied to underground waters."

If such statement is intended to carry the implication that such doctrine has been "adopted" or may be "applied" to underground waters generally or that it has been "applied" otherwise than in the case of *Horne* v. *Utah Oil Refining Company,* 59 Utah 279, 202 P. 815, 824, 31 A. L. R. 883, and the case of *Glover* v. *Utah Oil Refining Co.,* 62 Utah 174, 218 P. 955, 31 A. L. R. 900, it has not been my good fortune to discover such cases. Certainly the doctrine of correlative rights is not applicable to the instant case. Under the Utah statute (whatever the doctrine of correla-

tive rights may mean) the doctrine of reasonable use must be a limitation thereon. Mr. Justice Thurman recognized the inherent difficulties incident to an attempted harmonizing of the cases when in the case of *Horne* v. *Utah Oil Refining Co.*, supra, he said:

"The writer feels impressed to say he has no substantial doubt as to the justice and equity of the doctrine of reasonable use of percolating waters as between adjoining owners; but as to what constitutes a reasonable use the authorities are not as clear as might be desired. They seem to dwell mostly upon the point that it is not a reasonable use to convey the water away from the land in which it is found. It seems to me that the use of the water by an adjoining owner, to be a reasonable use, especially in an artesian district, should be limited first to his just proportion according to his surface area, and, second, he should not be entitled even to this quantity to the injury of others similarly situated, unless it is reasonably necessary for the beneficial purposes to which he devotes the water."

Water once appropriated under the Utah statutes, the right to the use thereof becomes vested. The right, leaving to one side for the moment the quantity, is fixed by the priority of appropriation, which appropriation is then limited by the purpose or use to which it is applied, and is further limited by the statutory declaration that "the appropriation must be for some useful and beneficial purpose, and, as between appropriators, the one first in time shall be first in right." R. S. Utah 1933, 100-3-1. The quantity or measure to be applied to the appropriation is, first, the quantity as measured by the original appropriation, and, second, as further limited, if the original appropriation was more than could be beneficially used, by the factual measure of beneficial use. The facts that determine the application of the legal limitation of beneficial use are matters of evidence, to be applied to the statutory declaration that, "beneficial use shall be the basis, the measure and the limit of all rights to the use of water in this state." R. S. 1933, 100-1-3.

Part of the excerpt above quoted from the prevailing opinion is:

"Under these circumstances the rule of law applicable is not that pertaining to correlative rights but the law of appropriation."

The opinion further says:

"Under the doctrine of appropriation there is no allowance for a landowner by means of tunnels or other artificial works to intercept a source of supply to streams or springs used by prior appropriators and to make such use of the water intercepted on the land where found or otherwise so as to diminish the quantity or deteriorate the quality of the water to the detriment of such prior appropriator. *Peterson* v. *Wood,* 71 Utah 77, 262 P. 828."

As thus stated, the discussion makes a water-tight case for the doctrine of priority of appropriation and beneficial use. It is then said:

"There is here no definite finding that defendants and their predecessors in interest had made their appropriations at a time when plaintiff's lands were still public domain, but enough appears in the evidence and the findings as to when plaintiff obtained patents to its land and the length of time defendants and their predecessors had used the water of the springs and streams, under their appropriations, to lead to the conclusion that defendants made their appropriations of the water before plaintiff's lands were segregated from the public domain."

It is the direct implication in the above quotation that, had the plaintiff's lands been segregated from the public domain, no matter how long defendants had enjoyed the use of an appropriation of water, the owner of the land may at any time intercept the source of or cut off a prior appropriation. No one familiar with the development of the use of water in this arid part of the country can be unfamiliar with the constantly progressive movement towards the sources of supply. Both quantity and quality factors demand the protection of sources.

I am fully aware of the numerous cases where such implication as contained in the above excerpt have been made, and certain other cases where the doctrine may have been applied to particularly stated facts and circumstances.

As was so aptly stated by Mr. Justice Thurman in the case of *Stookey* v. *Green,* 53 Utah 311, 178 P. 586, 589, "the importance of every decision by this court relating to the subject of irrigation and water rights, especially when we realize that even fugitive suggestions outside the issues of the case as well as expressions applicable to the facts may be erroneously referred to and relied" upon in subsequent cases, compels me to say that, while I am in general in harmony with the result reached, I cannot subscribe to the implications, neither do I feel to commit myself to the extent to which some of the statements in the prevailing opinion would bind one by an unqualified concurrence.